David J. WEIL, on behalf of himself
and all others similarly
situated, Plaintiff,

v.

MORGAN STANLEY DW INC., and
HarrisDirect LLC, Defendants.

C.A. No. 791–N.

Court of Chancery of Delaware,
New Castle County.

Submitted: May 25, 2005.
Decided: July 25, 2005.

Ronald A. Brown, Jr., Prickett, Jones & Elliott, P.A., Wilmington, DE; Arthur T. Susman, Charles R. Watkins, John R. Wylie, and Glenn L. Hara, Susman & Watkins, Chicago, IL; Mark G. Slutsky, Mark G. Slutsky & Associates, Lincolnshire, IL, for Plaintiff.

Jon E. Abramczyk, Morris, Nichols, Arsht & Tunnell, Wilmington, DE; William H. Pratt, Eric F. Leon, and Joshua B. Simon, Kirkland & Ellis, L.L.P., New York City, for Defendants Morgan Stanley DW Inc. and HarrisDirect LLC.

## OPINION

STRINE, Vice Chancellor.

In 2002, Morgan Stanley sold its online brokerage business and customer accounts to another firm, HarrisDirect. By contract with its customers—all of whom had the unfettered right to terminate their relationship with Morgan Stanley at any time—Morgan Stanley had clearly reserved the right to assign its customer accounts to a buyer such as HarrisDirect.

When Morgan Stanley sold to HarrisDirect, it sent information to its customers informing them of the sale and the services they would receive if they opted to continue on as HarrisDirect customers after the sale. Among those services was the option to continue to use money market sweep accounts, such as those Morgan Stanley offered. Through such accounts, customers may earn a modest amount of interest on uninvested cash in their brokerage portfolios. But for most of the former Morgan Stanley customers, like the plaintiff here, HarrisDirect intended to use its own sweep account funds, rather than the sweep account funds formerly used by Morgan Stanley.

The plaintiff here opted to stay with HarrisDirect and to use its sweep account services. He continued to use HarrisDirect's sweep account services for approximately sixteen months after the sale, and he did not suffer any loss from doing so. The plaintiff closed his accounts with HarrisDirect in November 2003. Yet, on November 2, 2004, more than two years after the sale and a year after closing his accounts, he brought this suit alleging that Morgan Stanley breached fiduciary duties it owed to him. His theory is that part of the $106 million HarrisDirect paid must have been attributable to its expectation that former Morgan Stanley customers would use HarrisDirect's sweep account services. The plaintiff claims that Morgan Stanley, in profiting by selling that expectation, was disloyal to its customers.

In this opinion, I reject the legal viability of this contention. In his contract, the plaintiff agreed that whatever rights he possessed against Morgan Stanley would be governed by California law, the state

where Morgan Stanley operated its online brokerage. Under California law, Morgan Stanley did not owe wide-ranging fiduciary duties to the plaintiff, for whom it merely provided non-discretionary investment services. Moreover, it is only because of his contract with Morgan Stanley that any fiduciary relationship of any kind was established and defined. That is, the existence, in the first instance, and the scope of any fiduciary duties owed to the plaintiff by Morgan Stanley turn on the contract they entered with each other.

By that contract, Morgan Stanley clearly reserved for itself the right to do what it did: to sell its brokerage accounts to a buyer like HarrisDirect.

That it had done so and that it expected to be paid $106 million in exchange for those accounts was fully disclosed to the plaintiff. He—and every other Morgan Stanley customer—clearly knew that HarrisDirect was paying Morgan Stanley for the opportunity to persuade former Morgan Stanley customers to remain with HarrisDirect and for the opportunity to sell services—like sweep accounts—to them. In other words, it was obviously central to the transaction that HarrisDirect was "buying" Morgan Stanley's customers in the non-pernicious sense that it "bought" the opportunity to service those clients if those clients did not decide, as was always their right at any time, to terminate their brokerage accounts. That was also specifically true as to sweep account services, which clients like the plaintiff were free not to use. Those customers were not forced to use HarrisDirect's services, nor were they misled in any way.

To indulge this claim would be to use the fiduciary duty tool for an improper purpose, permitting the plaintiff to rework a voluntary contractual relationship and capture a windfall gain while depriving Morgan Stanley of its reasonable expectations. By so doing, this court would invent an "equitable duty" of boundless scope when there is no inequity justifying that innovation and when this novelty would undermine both the economic fairness and the efficiency that result from the freedom to contract.

I cannot fathom how Morgan Stanley breached any fiduciary duty to the plaintiff by doing what the plaintiff had contractually agreed that it could do—assign his account agreement—and profiting from it. By its actions, Morgan Stanley did not usurp any value rightfully belonging to the plaintiff.

### I. *Factual Background*

These are the facts as pled in the complaint and the documents referenced therein. The plaintiff, David J. Weil, became a brokerage customer of Morgan Stanley[1] in 1999. At that time, Morgan Stanley operated an online brokerage business offering a variety of accounts to its customers. Most important for present purposes, Morgan Stanley offered a money market sweep feature for its customers. Unless its customers directed otherwise, Morgan Stanley swept their uninvested cash into customer-appropriate, interest-bearing money market funds operated by Alliance Capital Management. By this means, customers could earn some modest return from their undeployed cash on account with Morgan Stanley.

Weil opened two non-discretionary brokerage accounts with Morgan Stanley, the first in 1999 and the second in 2000, and used Morgan Stanley's sweep account ser-

---

1. During the relevant period, Morgan Stanley's brokerage business went by various names, including "Morgan Stanley Dean Witter Online Inc." For ease of reference, I refer to defendant Morgan Stanley DW Inc. and its predecessors in the relevant brokerage business as "Morgan Stanley."

vices in connection with both of those accounts. Weil signed applications in order to open his accounts. In those account applications, Weil specifically agreed and acknowledged that Morgan Stanley could "transfer [its Agreement with Weil] to Morgan Stanley Dean Witter Online's successors and assigns."[2] By signing the account applications, Weil also agreed to the terms of separate customer agreements that specifically stated:

> Successors. You hereby agree that this Agreement and all its terms shall be binding on your heirs, executors, administrators, personal representatives, and assigns. This Agreement will inure to the benefit of Morgan Stanley Dean Witter Online and its successors, assigns, and agents. Morgan Stanley Dean Witter Online may assign its rights and duties under this Agreement to any of its subsidiaries or affiliates without giving you notice, or to any other entity upon prior written notice to you.[3]

As important, the customer agreement gave Morgan Stanley the right to terminate Weil's accounts "at any time for any reason."[4] This made the relationship between Morgan Stanley and Weil reciprocal, as Weil retained the discretionary right to withdraw his funds at any time and to go to another broker. Neither the account applications nor the customer agreements gave Weil any right to compensation if Morgan Stanley terminated or assigned his accounts.

In June 2002, the events that give rise to this lawsuit began to unfold. At that time, Morgan Stanley notified its customers, including Weil, and the public that it had signed a contract with defendant HarrisDirect LLC. Under that agreement, Morgan Stanley agreed to transfer approximately 150,000 of its online brokerage accounts to HarrisDirect on July 26, 2002 and to depart the online brokerage business. In exchange, Morgan Stanley would receive $106 million from HarrisDirect.

As part of its effort to communicate that information, Morgan Stanley sent a letter to each of its online brokerage customers outlining the products and services that HarrisDirect offered and the effect that the agreement with HarrisDirect would have on them. That letter included descriptive information such as a copy of the new account agreement with HarrisDirect that would govern a customer's relationship with HarrisDirect if she wished to continue with them, and similar information about various kinds of accounts. This information was, of course, necessary if customers were to be afforded an opportunity to make decisions in the wake of the transaction with HarrisDirect. The letter also included a paragraph addressing customers like Weil who had sweep accounts. That paragraph stated:

> Conversion of Money Market Funds. If you currently have an Alliance Money Market Fund as your sweep fund, Harris *direct* will be offering a corresponding Alliance or Harris Insight Service Shares Money Market Fund. The enclosed prospectus and Money Fund comparison sheet are provided for your information and review. It is important that you read the prospectus and the Money Fund Comparison sheet, which outline the fees and investment objectives associated with each fund.[5]

In addition, Weil and other customers were sent a chart that compared, in detail, the terms and conditions of the various sweep account funds that they currently were invested in with Morgan Stanley and

---

**2.** Def. Br. at Ex. A.

**3.** Def. Br. at Ex. B.

**4.** *Id.*

**5.** Pl. Br. at Ex. A.

the new HarrisDirect sweep account funds that their cash would be transferred into as of July 26, 2002.

The chart also clearly stated:

Enclosed is a prospectus for the Service Shares of the Harris Insight Money Market Funds. Your current money market fund holdings will be exchanged for an equivalent amount of Service Shares of the corresponding Harris Insight Money Market Fund effective July 26, 2002 unless you have previously advised us to the contrary. You do not need to take any action in connection with the transfer and exchange of your account, and you will not be charged any fees for those transactions.

An investment in a money market fund is not a deposit in a bank and is not insured or guaranteed by the Federal Deposit Insurance Corporation (FDIC) or any other government agency. Although each money market fund seeks to preserve the value of your investment at $1.00 per share, it is possible to lose money by such an investment.[6]

This aspect of the deal with HarrisDirect is not hard to understand. Unlike Morgan Stanley, which contracted with Alliance Capital Management to provide sweep accounts, HarrisDirect apparently offered sweep accounts of its own. Where possible, therefore, HarrisDirect intended to use its own sweep account services to service the new brokerage customers transferred from Morgan Stanley. Where such transfers were not possible—for example, where customers used specialized sweep accounts (e.g., those invested in certain state-specific funds) of a type that HarrisDirect did not offer—HarrisDirect intended to use the same Alliance funds that Morgan Stanley had used, even after those customers' brokerage accounts were transferred to HarrisDirect.

The plaintiff, Weil, however, and the class of other customers he seeks to represent, were among those Morgan Stanley customers whose non-specialized sweep accounts, absent an election to discontinue their sweep account services or to terminate their brokerage relationships with HarrisDirect altogether, were transferred into HarrisDirect sweep accounts on July 26, 2002.

Weil has not pointed to any false or misleading statements by Morgan Stanley in communication with customers about the transaction with HarrisDirect that induced him to use the new sweep account services. At most, Morgan Stanley made the sort of positive introductory statements that any departing owner would make about a reputable new owner buying a business whose value depended on customer retention. This sort of obvious puffery, when unaccompanied by any false or misleading statements, is utterly harmless, and not actionable as a breach of fiduciary duty.

Having had the chance to terminate his relationship with Morgan Stanley or elect not to use a HarrisDirect sweep account, Weil made, by inaction, the election to stay with HarrisDirect and use its sweep accounts. Thus, on July 26, 2002, the money in his Alliance sweep accounts was transferred into new HarrisDirect sweep accounts. Weil retained his brokerage accounts, with their related sweep accounts, with HarrisDirect until November 2003.

On November 2, 2004, a leisurely amount of time since Weil closed his accounts and an even more languorous period since Weil accepted the transfer of his accounts to HarrisDirect, Weil brought this complaint.

Oddly, no economic setback related to the performance of the HarrisDirect

---

6. Pl. Br. at Ex. B.

sweep accounts inspired the filing of this suit. Weil does not allege that his Harris-Direct sweep accounts paid him a lower rate of return than he would have made had he remained invested in the prior Alliance funds.

It is not the case here that Weil, having suffered a loss at the hands of Morgan Stanley or HarrisDirect, now seeks redress for that injury. Weil was apparently apprised of the opportunity to prospect for upside gains, not because he was actually injured, but because certain case law in Delaware suggested to (one surmises) Weil's counsel that a windfall at Morgan Stanley's expense might be available to him and others similarly situated. That inference flows from the nature of the claim that Weil pleads in his complaint, which I describe next.

## II. Weil's Claim For Breach Of Fiduciary Duty

In his brief complaint, Weil pleads only two counts. Both center on the same conduct by Morgan Stanley.

Count One is directed at Morgan Stanley and alleges that Morgan Stanley breached a fiduciary duty of loyalty it owed to Weil and other brokerage customers in entering into the HarrisDirect transaction. The essence of this claim is that a portion of the $106 million that Morgan Stanley received from HarrisDirect must have been attributable to Morgan Stanley's agreement to facilitate the transfer of cash in its brokerage customers' sweep accounts to HarrisDirect sweep accounts.

According to Weil, Morgan Stanley therefore accepted funds—for whatever value HarrisDirect placed on this aspect of its agreement with Morgan Stanley—that somehow rightly belonged to Weil and other similarly situated customers.

Count Two of the complaint tracks Count One, and simply alleges that Harris-Direct aided and abetted Morgan Stanley's breach of fiduciary duty by negotiating the provision of the contract dealing with sweep accounts and that it therefore somehow "knowingly" participated in a breach of fiduciary duty.

## III. The Defendants' Motion To Dismiss

Morgan Stanley and HarrisDirect have moved to dismiss the complaint for failure to state a claim upon which relief can be granted. In addressing their motions, I therefore apply the settled standard applicable to motions under Rule 12(b)(6). Under that standard, I must accept all well-pled allegations of fact as true and draw all reasonable inferences in the plaintiffs' favor, but I cannot give weight to conclusory allegations of wrongdoing unsupported by pled facts.[7] In evaluating the motions, I may consider the undisputed terms of the documents fairly incorporated in the complaint,[8] various of which have been cited as indisputably authentic in the briefs of the parties.

## IV. From O'Malley v. Boris to Weil v. Morgan Stanley

As adverted to, Weil bases his claims on a series of decisions in another case—O'Malley v. Boris[9]—brought by his attor-

---

7. See, e.g., Solomon v. Pathe Communications Corp., 672 A.2d 35, 38 (Del.1996).

8. See Vanderbilt Income & Growth Assoc. v. Arvida/JMB Managers, Inc., 691 A.2d 609, 612–13 (Del.1996); In re Santa Fe Pacific Corp. S'holder Litig., 669 A.2d 59, 69–71 (Del. 1995).

9. The original decision in that case dismissed the complaint. O'Malley v. Boris, 1999 WL 39548 (Del.Ch. Jan. 19, 1999). The Supreme Court reversed that dismissal in O'Malley v. Boris, 742 A.2d 845 (Del.1999). Eventually, the plaintiffs were granted partial summary judgment on their claims in O'Malley v. Boris, 2002 WL 453928 (Del.Ch. Mar.18, 2002).

neys that involved facts that bear some faint resemblance to the ones alleged here. The analysis of Weil's claims is best done with an understanding of those decisions in mind.

The culminating decision in *O'Malley v. Boris,* which I will call *"O'Malley III,"* granted summary judgment for the customers of a brokerage firm whose money in sweep accounts had been transferred, with their silent consent, into new sweep accounts managed by a different adviser. In that case, the plaintiffs were brokerage clients of Everen, a full service brokerage firm.

Everen entered into a joint venture agreement with a group of financial services companies that I will refer to collectively as "Mentor." As part of the Mentor deal, a new Joint Venture would be formed to provide a variety of investment services, to Everen's existing brokerage clients, and, apparently, to other investors. For its participation in the deal, Everen was to receive at least 20% of the Joint Venture's stock. But Everen's ownership interest in the Joint Venture was contingent, and could increase to as much as 50% if a significant proportion of Everen's customers ultimately invested their cash in funds managed by the Joint Venture.

The sweep accounts of Everen customers were important in the Mentor transaction. Before the transaction with Mentor, Everen had used money market funds managed by the Zurich Kemper fund family to provide sweep account services to its customers. In its deal with Mentor, Everen agreed to facilitate the transfer of its clients' sweep accounts to the money market funds run by the Joint Venture (i.e., the Mentor funds) as well as to include the Joint Venture's other mutual funds and private account managers on its preferred list of recommended investment services. To consummate the transaction, Everen sent each of its clients who used sweep accounts a negative consent letter by which they were told that, unless they objected by a date certain, the cash in their sweep accounts would be transferred from Zurich Kemper funds into funds managed by the Joint Venture. Only 10% or so objected. The lion's share of the cash flowed into Joint Venture-managed sweep accounts, and Everen pumped up its ownership of the Joint Venture. At all times, Everen remained the broker of the affected clients.

In his final decision in the case—which apparently settled after the ruling—Chancellor Chandler held that Everen had breached its fiduciary duty of loyalty by premising its choice of the Joint Venture's sweep account funds for its brokerage clients not on what was best for the clients, but on its desire to receive stock in the Joint Venture. The Chancellor recognized that Everen's duty to its clients who had sweep accounts was limited because those accounts did not vest discretionary investment authority in Everen. Nonetheless, he concluded that Everen could not premise its choice of a provider of sweep account services on its own self-interest, but rather, it had to make that choice in a manner loyal to the best interests of its clients.[10] In the circumstances before him, the Chancellor concluded that Everen's only reason for switching sweep account fund providers was to induce Mentor to provide it with 20% of the Joint Venture, and if its contractual promise to recommend the new Mentor funds persuaded enough Everen customers to agree to the transfer, as much as a 50% interest in the Joint Venture. For that reason, the Chan-

For ease of reference, I will refer to these decisions, respectively, as *"O'Malley I," "O'Malley II,"* and *"O'Malley III."*

**10.** *O'Malley III,* 2002 WL 453928, at \*3.

cellor reasoned that Everen had essentially been paid to replace its clients' current provider of sweep account services with another and to recommend that its clients to continue to use the services of the new provider.

Furthermore, the Chancellor found that Everen's breach of the duty of loyalty had not been ratified by the choice of a majority of its clients to transfer their cash to the new sweep accounts provided by the Joint Venture. Bound in large measure by the Supreme Court's prior ruling in *O'Malley II*, the Chancellor concluded that Everen had not adequately disclosed its self-interest in recommending that its clients move their funds into the new Joint Venture sweep accounts. Specifically, he found that Everen had not adequately disclosed: 1) that it received 20% of the Joint Venture not for cash, but in exchange for its promise to recommend Joint Venture-provided services, such as the sweep accounts, to its brokerage customers; and 2) that it would receive additional equity in the Joint Venture if its recommendations to use the Joint Venture's sweep accounts received sufficient assent from its clients.[11] Had Everen's clients known of the economic motivations Everen had for recommending that they permit the transfer of their cash from the Kemper Zurich sweep accounts into the accounts provided by the Joint Venture, the Chancellor believed that their decision-making process might have been affected. As a result, he concluded not only that Everen's failure to provide this material information prevented it from obtaining ratification effect, but also that the failure to disclose that material information itself constituted an additional breach of fiduciary duty.

The Chancellor's decision was also predicated on a determination of choice of law he had made in his original decision addressing the defendants' motion to dismiss, *O'Malley I*. In the dismissal decision, the Chancellor concluded that the customers' claims against Everen were governed by Delaware law. Everen was headquartered in Illinois and its brokerage customers were scattered throughout the nation. Everen's contracts with its clients contained an express Illinois choice of law provision. Nonetheless, the court held that Delaware had the most significant relationship to the customers because Everen was a Delaware corporation and "where a Delaware corporation is sued in a class action over a corporate law issue … it is proper to apply Delaware substantive law, except where there was an explicit agreement between the members of the class and the defendant to do otherwise…."[12] The choice of law determination was never appealed to the Supreme Court.

By analogy to the *O'Malley* line of cases, Weil argues: 1) that his and the class's claims are governed by Delaware law because Morgan Stanley is a Delaware corporation; 2) that a portion of the $106 million that Morgan Stanley received for selling its brokerage business to HarrisDirect must have been attributable to profits HarrisDirect expected to make from providing sweep account services to former Morgan Stanley clients like Weil, whose sweep account services HarrisDirect would provide absent an affirmative choice by the clients to the contrary; and 3) that Morgan Stanley was precluded, by its duty of loyalty to Weil and its other brokerage clients, from receiving consideration from HarrisDirect, as a purchaser of its brokerage business, attributable in any part to HarrisDirect's expectation that Morgan Stanley clients would roll over the cash in their sweep accounts into new sweep accounts managed by HarrisDirect.

---

11. *Id.* at *6–7.

12. *O'Malley I,* 1999 WL 39548, at *3.

For reasons I now explain, I conclude that these arguments lack legal merit and that Weil's claims must be dismissed.

## V. California Law, Not Delaware Law, Governs The Relationship Between Morgan Stanley, As A Broker, And Weil, Its Customer

■ Weil is a resident of Illinois. When he and other Morgan Stanley customers signed up for on-line brokerage services, they agreed to the following choice of law provision:

> h. Choice of Law. This Agreement shall be deemed to have been made in the State of California and shall be construed, and the rights and liabilities of the parties determined, in accordance with the laws of the State of California.[13]

The choice of California law also had a geographic nexus to the parties' relationship, as Morgan Stanley's online brokerage business, with which Weil and the putative class he seeks to represent contracted, was headquartered in San Francisco.

Under Delaware law, the choice of law provision Weil assented to must be respected as long as the law selected "bears some material relationship to the transaction."[14] In this instance, Morgan Stanley was headquartered in California, and it was therefore logical for it to premise its relationship with its customers on that state's law. As important, given that Morgan Stanley was doing business nationwide, if not worldwide, it had an interest in ensuring that a single body of law governed all of its customer relationships.

■ Because the California choice of law provision is valid, the question of its proper scope is also a question of California law, as it turns on how the choice of law provision should be read.[15] This is a matter of hornbook law.[16]

In my view, the question of whether the parties' choice of law extends to cover claims for breach of fiduciary duty is not a close one. Any fiduciary duties Weil claims are owed to him by Morgan Stanley arise solely out of the relationship created by his contract with Morgan Stanley. In that contract, Weil plainly agreed that the "rights and liabilities of the parties" were to be "determined ... in accordance with the laws of the State of California."

That text should not be interpreted in a crabbed way that creates a commercially senseless bifurcation between pure contract claims and other claims that arise solely because of the nature of the rela-

---

**13.** Def. Br. at Ex. B.

**14.** *Annan v. Wilmington Trust Co.*, 559 A.2d 1289, 1293 (Del.1989) (citing *Wilmington Trust Co. v. Wilmington Trust Co.*, 24 A.2d 309, 313 (Del.1942)).

**15.** *See, e.g., Odin Shipping Ltd. v. Drive Ocean V MV*, 221 F.3d 1348 (Table), 2000 WL 576436, at *1 (9th Cir.2000) ("The scope of [a choice of law provision] is a matter of contract construction and interpretation ... which would in turn be governed by the law selected in the choice-of-law provision.") (citations omitted); *Washington Mut. Bank, FA v. Superior Court*, 24 Cal.4th 906, 103 Cal. Rptr.2d 320, 15 P.3d 1071, 1078 n. 3 (2001) ("the scope of a choice-of-law clause in a contract is a matter that ordinarily should be determined under the law designated therein"); *Roll Int'l Corp. v. Unilever United States, Inc.*, 2001 WL 1345012, at *5 (Cal.Ct.App. Nov. 1, 2001) ("the scope of the choice of law provision is a question of contract interpretation that should ordinarily be determined pursuant to the laws of ... the foreign jurisdiction whose law the parties chose.").

**16.** *See* Restatement (Second) of Conflict of Law §§ 187, 205 (1971). Section 205 states that "The nature and extent of the rights and duties created by a contract are determined by the local law of the state selected by application of the rules of [§ 187]." Section 187 provides that parties may, through the use of choice of law provisions, designate the law of a certain state to govern their agreement.

tions between the parties created by the contract. In *Nedlloyd Lines B.V. v. Superior Court of San Mateo County*, the California Supreme Court interpreted a shareholders' agreement containing a choice of law provision stating that "[t]his agreement shall be governed by and construed in accordance with Hong Kong law...."[17] Its en banc decision held that the provision was broad enough to cover all claims arising from or related to the shareholders' agreement, including a claim for breach of fiduciary duty. In so ruling, the California Supreme Court aptly noted:

> When a rational businessperson enters into an agreement establishing a transaction or relationship and provides that disputes arising from the agreement shall be governed by the law of an identified jurisdiction, the logical conclusion is that he or she intended that law to apply to *all* disputes arising out of the transaction or relationship.[18]

That reasoning applies with full force here. The scope of any fiduciary obligations Morgan Stanley owed to Weil must be determined by reference to the contract between them. Why? Because Weil claims that Morgan Stanley, as his agent-broker, breached fiduciary duties that it owed to him as a result of the contractual relationship they had formed. Therefore, to determine whether that is so, one must look to the contract to determine "the scope of the agency set forth in the agreement" between Weil and Morgan Stanley.[19]

■ In this case, for example, one cannot evaluate Weil's contention without examining several relevant provisions of the contract that define the nature of the power Morgan Stanley would undertake over Weil's property. For example, an important provision of the contract reflects Weil's acknowledgement of Morgan Stanley's limited role, including the fact that Morgan Stanley would not be providing him with investment advice:

> By entering into this Agreement, you acknowledge that *decisions relating to your investments* or trading activity *must be made by you or your duly authorized representative.* Morgan Stanley Dean Witter Online *will not provide you with any* legal, tax or accounting advice or *advice regarding the suitability or profitability of a security or investment.* You also acknowledge that Morgan Stanley Dean Witter Online's employees are not authorized to give any such advice and that *you will not solicit or rely upon any such advice from them or from Morgan Stanley Dean Witter Online.* You agree that *Morgan Stanley Dean Witter Online* and its officers, directors, employees, agents and affiliates *will have no liability for the investment decisions made for your account.*[20]

Under California law, the scope of any fiduciary duties owed by a broker to its client is (understandably) extremely narrow when the broker does not exercise any discretion over the client's accounts. In that circumstance, the broker's duty is to faithfully execute the client's desired transactions and does not include any fiduciary obligations for investment decisions or suggestions.[21]

---

**17.** 3 Cal.4th 459, 11 Cal.Rptr.2d 330, 332, 834 P.2d 1148 (1992).

**18.** *Id.* at 336, 834 P.2d 1148 (emphasis in original).

**19.** *See, e.g., Meyers v. Guarantee Savings & Loan Ass'n,* 79 Cal.App.3d 307, 144 Cal.Rptr. 616, 620 (1978).

**20.** Def. Br. at Ex. B. (emphasis added).

**21.** *See, e.g., Caravan Mobile Home Sales, Inc. v. Lehman Bros. Kuhn Loeb, Inc.,* 769 F.2d 561, 567 (9th Cir.1985).

Moreover, I do not believe one can make any principled determination of what, if any, fiduciary duty Morgan Stanley owed to Weil without considering other elements of the parties' contract, including the provisions granting Morgan Stanley the right to freely assign Weil's accounts and to terminate its relationship with Weil at any time and for any reason, or Weil's reciprocal right to terminate his relationship with Morgan Stanley at any time. To a large extent, Weil now claims that a supervening fiduciary duty on Morgan Stanley's part sharply limits Morgan Stanley's right of assignment. I fail to grasp any principled basis for evaluating Weil's fiduciary duty claim under a law different from that which the parties chose to govern the contract between them, precisely because any fiduciary relationship between Weil and Morgan Stanley is defined in the first instance by their contract. Rather, what seems evident is that the parties agreed to a broad choice of law provision that would encompass all claims between them arising out of their contractual relationship.

But Weil nonetheless contends that Delaware law governs his fiduciary duty claim against Morgan Stanley. He bases that argument, however, on a fact about Morgan Stanley that has no bearing on the present case—the fact that Morgan Stanley is a Delaware corporation.

Had Weil bought stock in Morgan Stanley and later brought a claim that its board and top managers were engaged in self-dealing, his argument would have purchase. In that instance, Weil would have every right to expect that any fiduciary duties owed to him by Morgan Stanley's directors and officers would be governed by Delaware law. The reason is that in that context Morgan Stanley's incorporation in Delaware was, in itself, a choice of law decision. By that decision, Morgan Stanley elected to have the internal affairs of the corporation governed by Delaware law. That choice means not only that its stockholders would have their *contractual rights* under the corporation's charter and bylaws determined under Delaware law, but that the scope of the *fiduciary duties* owed by the firm's directors and officers to its stockholders would also be decided by Delaware law.

But Morgan Stanley's decision to incorporate in Delaware has no bearing on its relationship with Weil. Weil entered into a brokerage client relationship with Morgan Stanley and agreed that that relationship would be governed by California law—the law of the state where Morgan Stanley's relevant operations were located. In no rational way could Weil have factored Morgan Stanley's status as a Delaware corporation into his decision to become a client, because Morgan Stanley's Delaware status has only the (admittedly quite important) effect of establishing that Delaware law will govern the internal affairs of that firm.

Indeed, by parity of reasoning, Weil's decision to sign the contract with a broad California choice of law provision was analogous to that of someone who purchases shares of stock in a Delaware corporation. Anyone who purchases stock in a Delaware corporation acknowledges that the fiduciary duties that the corporation owes to her as a stockholder are defined by Delaware law. Likewise, by signing the contract, Weil acknowledged that whatever duties Morgan Stanley owed to him arose out of the contractually-created relationship and would be defined by California law. He is now bound by that contractual agreement.

In his initial decision in *O'Malley v. Boris I,* the Chancellor held that Everen's status as a Delaware corporation was relevant "where a Delaware corporation is sued in a class action over a corporate law issue...."[22] I do not disagree with that

---

22. 1999 WL 39548, at *3.

general statement, but I find it inapposite here.[23] Morgan Stanley has not been sued in a class action over a corporate law issue. The only issue is whether it, as a broker, breached any fiduciary duties to its clients. That issue is one that has nothing logically to do with Morgan Stanley's status as a Delaware corporation.

It would thus be imprudent and inconsistent for a Delaware court to fail to give determinative weight to the parties' choice of California law. Our state obviously relies upon the willingness of other state courts to honor the choice of law reflected in the corporate charters of Delaware firms, even when the parties before them are not geographically situated in Delaware. When the fact of Delaware incorporation has no bearing on the parties' relationship, and they have agreed to a broad choice of law provision that logically governs the claims brought before a Delaware court and that selects another state's law to govern, that choice of law provision must and should be respected by our judiciary.

For all these reasons, California law governs Weil's claim for breach of fiduciary duty.

## VI. Weil Has Failed To State A Claim For Breach Of Fiduciary Duty Under California Law

■ With the governing law settled, I now evaluate whether Weil has stated a claim for breach of fiduciary duty. The gist of Weil's claim is, as discussed, grounded in the decisions in O'Malley v. Boris and the theory that Morgan Stanley could not, as an upstanding fiduciary, be paid by HarrisDirect for any expectation by HarrisDirect that it would, as the purchaser of Morgan Stanley's online brokerage accounts, be able to provide sweep account services for former Morgan Stanley customers who elected to stay as brokerage customers of HarrisDirect.

That contention, however, does not state a claim for breach of fiduciary duty under California law. As noted previously, any fiduciary duties Morgan Stanley owed to Weil were limited by "the scope of the agency set forth in the agreement."[24] As a broker administering a non-discretionary brokerage account for Weil, Morgan Stanley owed him only very limited, transactionally-specific duties,[25] that were not implicated at all by its decision to sell its brokerage business to HarrisDirect.[26] Indeed, Weil must admit that Morgan Stan-

---

**23.** One cannot tell from reading the various O'Malley v. Boris decisions whether a corporate law issue was present that influenced the choice of law determination. By the express reasoning of the decision, the presence of a corporate law issue was what drove the choice of law determination. No such issue is presented in this case and the reasoning of O'Malley v. Boris I is therefore not pertinent here.

**24.** Meyers, 144 Cal.Rptr. at 620. See also Restatement (Second) of Agency §§ 376, 377 (1958).

**25.** See Caravan, 769 F.2d at 567 (holding that a stockbroker assumes no obligations over a non-discretionary account beyond the duty to faithfully execute transactions ordered by the client); Leboce, S.A. v. Merrill Lynch, Pierce,

Fenner & Smith, Inc., 709 F.2d 605, 607 (9th Cir.1983) (ruling that California law imposes fiduciary obligations on a broker when it controls a client's account, but imposing no fiduciary duties on a stockbroker that provided its client with no investment advice and had no authority to make trades on the client's account, noting that the broker's duties to its client "were limited by the narrow extent of its agency").

**26.** I put aside outrageous scenarios whereby a broker knowingly sells itself and assigns its customer accounts, not to a reputable broker, but a known looter, and, furthermore, does so without disclosing the looter's past. Those sorts of scenarios have no reasonable relationship to Morgan Stanley's sale to HarrisDirect.

ley could have terminated Weil as a brokerage customer at any time and would simply have had the responsibility to responsibly transfer the assets in his accounts back to him, or to whatever institution he chose for their receipt. The value of his accounts at the time of such determination would have been a function of Weil's own investment decisions and not those of Morgan Stanley. Put simply, this is not a situation involving a broker with wide-ranging investment authority over a client's assets.

But, of course, Weil is not before the court alleging that he was injured by any imprudent investment decision (or even any bad advice) provided to him by Morgan Stanley. His argument is more extreme: Morgan Stanley could not, without breaching some vague fiduciary duty of loyalty, be paid any money attributable to a purchaser's expectation that it would, as a result of the purchase, be able to derive profits by providing sweep account services to former Morgan Stanley customers who chose to stay with the purchaser.

To analyze why this contention is untenable, it is useful to expand its premise to its logical perimeter. If reasoning of this kind is sound, it makes no sense to single out "sweep account" services for special treatment. There is, I venture, no special duty not to profit from the sale of terminable at-will sweep account services that would not also logically apply to the sale of terminable at-will broker accounts.[27] Put simply, if Morgan Stanley was forbidden as a fiduciary from marketing the goodwill in its brokerage business—i.e., the likelihood that a large percentage of its customers would maintain sweep accounts with

and buy similar services from the buyer—then that bar logically applies not just to sweep accounts, but to all aspects of the client relationships that Morgan Stanley was transferring to the buyer. Thus, in my view, holding that Weil has stated a claim as to the sweep account aspect of the HarrisDirect transaction would also imply that the entirety of that transaction involved a breach by Morgan Stanley of its fiduciary duty of loyalty to its customers. There can be no doubt that what HarrisDirect was paying for was the opportunity to service Morgan Stanley's client accounts, betting that it could convince those clients, by its own superior performance, to remain HarrisDirect customers after the sale.

To conclude so, of course, would be to embrace a legal theory having no principled ground in equity or in economic rationality. By the plain words of his contract with Morgan Stanley, Weil agreed that Morgan Stanley could assign his account agreement to a successor. He, like the class of clients he purports to represent, was therefore under no illusion that Morgan Stanley could not profit by a sale of that contractual relationship. By contract, Weil expressly acknowledged that reality. Through his current suit, Weil essentially seeks to override his contractual promise by illogically asserting that although Morgan Stanley could assign its rights under the contract, it could not be paid for that assignment.

But he pleads no facts that tug at the heartstrings of equity. Typically, fiduciary duties are imposed when someone exercises dominion and control over the assets and property of another such that the con-

---

**27.** Indeed, Weil has not alleged that HarrisDirect paid any specific portion of the total $106 million purchase as a result of the profits expected from providing sweep account services to former Morgan Stanley customers. That failure is logical as HarrisDirect was obviously buying the opportunity to profit by selling a full range of services to the former Morgan Stanley customers, of which sweep account services was just one, likely relatively minor, type.

trolling person should be prohibited from dealing with those assets and property in a manner that unfairly profits himself. But Morgan Stanley did not occupy such a position of power over Weil's assets.[28]

Weil was free to terminate his brokerage relationship with Morgan Stanley at any time. Indeed, when he was informed of the sale to HarrisDirect, he had the right to close his accounts. Likewise, Weil was free to continue with HarrisDirect as a brokerage client but to decide not to use its sweep account services. All that Morgan Stanley profited from, therefore, was a right that it clearly contractually retained: the right to sell its brokerage business, including its brokerage accounts, to a buyer that would take the risk of trying to keep enough of those customers to justify the purchase price. I find nothing in California law to suggest that by doing so, Morgan Stanley breached any fiduciary duty it owed to Weil.

Likewise, there is nothing in the record suggesting that Morgan Stanley misled Weil or others into staying with HarrisDirect or using its sweep account services. In that regard, what the record reflects is that Morgan Stanley gave Weil solid, descriptive information that informed him of the material facts necessary for him to consider what to do in light of the sale to HarrisDirect. Specifically, Morgan Stanley provided factual information about HarrisDirect's sweep account funds and how those funds differed from the funds that Morgan Stanley had made available to its clients. None of Morgan Stanley's communications were factually misleading, and, at their most sales-oriented, they involved only the sort of positive introduction a seller would give its customers to a reputable buyer. In fact, the specific information Morgan Stanley provided is pre-

cisely the kind of communication that a broker has to give its clients to permit them to make reasoned decisions in the wake of the broker's decision to sell their accounts. In sum, Weil has identified nothing that was misleading or coercive about Morgan Stanley's communications to him.

As important, there can be no doubt that Weil and every other similarly situated customer knew that Morgan Stanley was being paid for transferring to HarrisDirect the right for that firm to try to retain, and profit from performing services for, the former Morgan Stanley customers. After all, Morgan Stanley was exiting the online brokerage business altogether as a result of the transaction!

Thus, even if Weil is correct, and the *O'Malley v. Boris* decisions have some relevance, those decisions would not lead to the conclusion that he has pled a claim against Morgan Stanley. In *O'Malley v. Boris*, Everen—the defendant-broker—changed the sweep account provider for its own ongoing clients. Everen was not exiting the business—it continued to be its clients' broker. But Everen failed, it was found, to inform its clients that it had received 20% of the stock of a valuable new joint venture in exchange for changing sweep account providers and that it could receive up to 50% of the joint venture's stock if enough of its customers used the new sweep account provider. This information, this court held, would have been material to Everen customers assessing whether to use the new sweep account provider. In other words, the court found that a broker could not recommend a new investment provider to its clients without also informing its clients that it was being paid to do so and that it

28. Obviously, Morgan Stanley could not steal Weil's funds. Both concepts of agency and criminal law make that plain.

would be paid even more if more of its clients accepted its recommendation.

This case is very different. All of Morgan Stanley's customers knew that Morgan Stanley would not be their broker at all after the HarrisDirect sale was consummated. All of them knew that Morgan Stanley had been paid $106 million by HarrisDirect because HarrisDirect believed that price was justified based on the later profits it would receive from providing services of all kinds—including sweep accounts—to those Morgan Stanley customers who chose to remain with HarrisDirect. And all of those customers received non-misleading factual information from Morgan Stanley that informed them of HarrisDirect's new services and how they compared to those Morgan Stanley provided, and that also specifically advised them of their right to having their accounts transferred to another financial institution. Morgan Stanley also specifically informed its customers that HarrisDirect would be providing its own sweep account funds to those of the former Morgan Stanley customers for whom they could provide a fund similar to the Alliance Capital product they were using. That disclosure made absolutely clear what was already obvious—HarrisDirect hoped to profit from the purchase by providing services to those of the Morgan Stanley customers who elected to stay, including those who opted to stay and to use the optional sweep account service.

And, of course, it should not be forgotten that Weil himself chose to stay at HarrisDirect, chose to use its sweep account services, and has not alleged that he suffered any adverse economic consequences from those decisions. Rather, Weil simply seeks a cut of the profits that Morgan Stanley legitimately obtained from selling the most valuable asset of its online brokerage business—its customer relationships. Having contractually agreed that Morgan Stanley could do that, it comes with ill grace and no legal force for Weil to claim otherwise now.

Under California law, I therefore conclude that Weil has failed to state a claim for breach of fiduciary duty. Even if Delaware law were somehow to apply, I would still conclude that the complaint fails to state a claim. Nothing in the underlying relationship of the parties would justify the extreme finding that Morgan Stanley was duty bound to share some of the price of selling its online brokerage business with at-will clients who contractually agreed that Morgan Stanley could sell their accounts and who could protect themselves by simply refusing to do business with the purchaser.

To use the potent fiduciary duty tool to reconstruct the contractual relationship Weil knowingly forged with Morgan Stanley would be unjust, and would subvert the very purpose of this court, to ensure that equity is done. Not only that, imposing an unprincipled fiduciary duty of this kind on brokers who seek to sell their businesses would serve no useful purpose. At best, it would sharply diminish the value of brokers, while generating no appreciable benefit to their customers. At worst, it would constitute the thin edge for a new body of judicially-created fiduciary duty law. This body of law would prevent businesses who perform services that give rise to certain fiduciary duties—for example, lawyers, bankers, doctors, and so forth—from selling themselves to purchasers who hope, by good performance, to retain the former owners' client base—at least, unless they somehow shared a part of the purchase price with their clients, even if the clients always possessed and continued to retain the right to use another provider. I fail to perceive in this scenario anything resembling the circumstances that traditionally warrant equity's intrusion into commercial affairs.

## VII. *Weil's Claim That HarrisDirect Aided And Abetted A Breach Of Fiduciary Duty Must Also Be Dismissed*

■ Weil also alleges that HarrisDirect aided and abetted Morgan Stanley's breach of fiduciary duty. That count must be dismissed for two reasons. First, having failed to state an underlying claim for breach of fiduciary duty against Morgan Stanley itself, Weil's aiding and abetting claim against HarrisDirect necessarily fails.[29] Second, the complaint fails to allege any facts that support an inference that HarrisDirect knowingly participated in any breach by Morgan Stanley, a required element for an aiding and abetting claim.[30] Weil's conclusory contention that HarrisDirect must have known of the Delaware Supreme Court's decision in *O'Malley v. Boris* has no force in this regard.

As I have discussed, *O'Malley v. Boris* dealt with a very different, and highly unusual, set of facts which were addressed under Delaware law. It is absurd to think that HarrisDirect, even had it read the various *O'Malley v. Boris* decisions, would have concluded that it was assisting Morgan Stanley in being fiduciarily disloyal to its customers by buying Morgan Stanley's entire on-line brokerage business when Morgan Stanley's customer contracts made plain that Morgan Stanley had the right to assign their accounts.

## VIII. *Conclusion*

For all these reasons, Weil's complaint is dismissed. IT IS SO ORDERED.

**29.** *See, e.g., McGowan v. Ferro,* 859 A.2d 1012, 1041 (Del.Ch.2004).

**30.** *See, e.g., In re Lukens Inc. S'holders Litig.,* 757 A.2d 720, 734–5 (Del.Ch.1999), *aff'd,* 757 A.2d 1278 (Del.2000).