# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| THERMOPYLAE CAPITAL PARTNERS, L.P. and M. SCOTT CONLEY, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 10619-VCG |
| | ) | |
| SIMBOL, INC., JOSHUA L. GREEN, PAUL B. CLEVELAND, WILLIAM ERICSON, MOHR DAVIDOW VENTURES, MDV IX, L.P., TAKASHI SUNADA, ITOCHU CORPORATION, JOHN ASHBURN, MARTIN L. LAGOD, FIRELAKE STRATEGIC TECHNOLOGY FUND, II, L.P., FIRELAKE INVESTORS FUND, II, L.P., FIRELAKE CAPITAL MANAGEMENT LLC, and JOHN BURBA, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted:  October 28, 2015
Date Decided:  January 29, 2016

Sidney S. Liebesman, Lisa Zwally Brown, and Chad Flores, of MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP, Wilmington, Delaware, *Attorneys for Plaintiffs*.

Peter J. Walsh and Tyler J. Leavengood, of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; OF COUNSEL:  Matthew Rawlinson and James H. Moon, of LATHAM & WATKINS LLP, Menlo Park, California, *Attorneys for Defendants Martin Lagod, Firelake Strategic Technology Fund, II, L.P., Firelake Investors Fund, II, L.P., and Firelake Capital Management LLC*.

Rudolf Koch, Susan M. Hannigan, and Matthew D. Perri, of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware, *Attorneys for Defendants Takashi Sunada and Itochu Corporation.*

Elena C. Norman, James M. Yoch, and Lakshmi A. Muthu, of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; OF COUNSEL: J. Daniel Sharp, of CROWELL & MORING LLP, San Francisco, California, *Attorneys for Defendants Mohr Davidow Ventures, MDV IX, L.P., Joshua L. Green, Paul B. Cleveland, and William Ericson.*

Patricia R. Urban, of PINCKNEY, WEIDINGER, URBAN & JOYCE LLC, Greenville, Delaware; OF COUNSEL: Alan J. Stone and Hailey DeKraker, of MILBANK, TWEED, HADLEY & McCLOY LLP, New York, New York, *Attorneys for Defendants John Ashburn and John Burba.*

Patricia L. Enerio and Aaron M. Nelson, of PROCTOR HEYMAN ENERIO LLP, Wilmington, Delaware, *Attorneys for Defendant Simbol, Inc.*

GLASSCOCK, Vice Chancellor

The Plaintiffs here are M. Scott Conley—a founder and stockholder of Simbol, Inc., ("Simbol" or the "Company")—and stockholder Thermopylae Capital Partners, LP ("Thermopylae"), an entity that Conley controls. This matter involves a dilution claim by the Plaintiffs. They allege that the Simbol board, as directed by a controller of the corporation, Defendant Mohr Davidow Ventures ("MDV"), and aided by other defendants, breached fiduciary duties to the common stockholders by issuing stock to the CEO; and that that stock was ill-gotten, in that it was acquired by Simbol from a former CEO who was contractually bound by a right of first refusal in favor of the Plaintiffs, which the ex-CEO breached in selling the stock back to the Company. This transaction, according to the Plaintiffs, was wrongfully dilutive of their interests. The Plaintiffs also allege that those controlling Simbol authorized a reduction of the share price for a preferred stock offering, in a way the Plaintiffs contend diluted their ownership. In addition, the Plaintiffs allege much past wrongdoing by MDV and other defendants in the many years since Simbol's founding, which they contend demonstrates the controlling nature of MDV's interest in Simbol. The Plaintiffs, however, conceded at oral argument that those earlier incidents alleged wrongs to the Company, which they have not attempted to pursue derivatively. The Plaintiffs therefore seek redress here only for the dilution claims.

The matter is before me on motions to dismiss. Because the claims brought are direct, the Plaintiffs are held only to the low notice pleading standard of Rule

1

12(b)(6). The complaint was brought without full recourse to document production available under Section 220 of the Delaware General Corporation Law ("DGCL").[1] The Plaintiffs have pleaded a complaint that omits pertinent facts to which they would have been entitled as stockholders under Section 220. The complaint therefore tests the limits of "reasonable conceivability" under Rule 12(b)(6), by asking that I speculate as to fundamental facts necessary for the Plaintiffs to prevail. The situation the Plaintiffs describe excites equitable antennae, because at least some of the directors had dual loyalties to the Company and to those with whom it transacted. Nonetheless, for the following reasons, I find the Plaintiffs' complaint deficient, and dismiss the action, without prejudice to any stockholder availing itself of the tools at hand to bring a properly pled derivative action, should that prove appropriate.

## I. BACKGROUND[2]

The following facts are taken from the Plaintiffs' Verified Complaint. They go far beyond the two transactions that are alleged to give rise to liability here, and include earlier transactions that, according to the Plaintiffs, demonstrate MDV's control of Simbol and willingness to use that control for its own benefit.

---

[1] The Plaintiffs made a Section 220 demand on Simbol but did not litigate the matter when faced with Simbol's allegedly incomplete document production, instead relying on what they contend is "more than sufficient detail in this complaint." *See* Oral Argument Tr. 57:6–17.

[2] The facts, drawn from the Plaintiffs' Verified Complaint (the "Complaint" or "Compl."), are presumed true for purposes of evaluating the Defendants' Motions to Dismiss.

## A. The Parties

Plaintiff M. Scott Conley is a "substantial" common stockholder of Simbol, holding 444,400 shares.[3] He served on Simbol's board of directors (the "Board") from in or about January 2012 to in or about December 2012,[4] and served as "COO and senior most executive" to Simbol as of January 15, 2013.[5] Conley and non-party Luka Erceg are the co-founders of Simbol.[6] Plaintiff Thermopylae is another "substantial" common stockholder of Simbol, holding 666,600 shares, and is controlled by Conley.[7]

Defendant Simbol is a Delaware corporation with its principal place of business in Pleasanton, California.[8] Defendants Joshua Green, Paul B. Cleveland, William Ericson, Martin L. Lagod, Takashi Sunada, John Burba, and John Ashburn are all current or former Board members (collectively, the "Director Defendants"). Green is a general partner of Defendant Mohr Davidow Ventures ("MDV") and

---

[3] Compl. ¶¶ 1, 10. I note that this is around 1% of the total 45,954,905 shares of common stock that are authorized under Simbol's 2012 Amended and Restated Certificate of Incorporation. Transmittal Aff. of James M. Yoch, Jr., Ex. A ("Am. and Restated Cert. of Incorp."), at Art. IV. The Amended and Restated Certificate of Incorporation is incorporated by reference and integral to the Complaint, as the Plaintiffs' claims are based in part on the contents therein. *See Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 188 (Del. Ch. 2006) ("In evaluating the complaint, the court may also consider the unambiguous terms of those documents incorporated by reference in the complaint . . . ."). The Complaint does not allege the total number of outstanding common shares or the total number of stockholders with holdings in Simbol.
[4] Compl. ¶ 10.
[5] *Id.* at ¶ 95.
[6] *Id.* at ¶¶ 1, 10, 23.
[7] *Id.* at ¶ 9. Thermopylae is described as "a limited partnership in which Conley is involved." *Id.* at ¶ 1.
[8] *Id.* at ¶¶ 1, 11.

3

served on the Board "at all material times," allegedly representing MDV's interests.[9] Cleveland served on the Board from in or about February 2012 to in or about December 2012, allegedly representing MDV's interests, and previously was a general partner and the chief operating officer of MDV.[10] Ericson served on the Board from in or about January 2013 to in or about February 2013, allegedly representing MDV's interests, and is a general partner of MDV.[11] Lagod is a managing director and co-founder of Defendant Firelake Capital Management LLC, and served on the Board from in or about May 2011 to in or about January 2012, allegedly representing the interests of Firelake Capital Management LLC and the other Firelake entitles controlled by it.[12] Sunada has been at "all material times" a member of the Board, serves as the Chief Financial Officer of Simbol, and previously served as a manager for Itochu Corporation ("Itochu").[13] Burba joined the Board in or about August 2013 and currently serves as Simbol's President and Chief Executive Officer.[14] Finally, Ashburn joined the Board in or about December 2013 and serves as the Chief Legal Officer of Simbol.[15]

Defendant MDV is a Delaware limited partnership and venture capital firm

---

[9] *Id.* at ¶ 12.
[10] *Id.* at ¶ 13.
[11] *Id.* at ¶ 14.
[12] *Id.* at ¶ 16.
[13] *Id.* at ¶ 18.
[14] *Id.* at ¶ 20.
[15] *Id.* at ¶ 21.

4

with its principal place of business in Menlo Park, California.[16] MDV operates through various limited partnerships, including Defendant MDV IX, L.P. ("MDV IX"), a Delaware limited partnership and preferred shareholder of Simbol that is controlled by MDV.[17] (MDV and MDV IX are collectively referred to as "MDV.") MDV holds a majority of Simbol's Series A preferred stock.[18]

Defendants Firelake Strategic Technology Fund, II, L.P. and Firelake Investors Fund, II, L.P. are Delaware limited partnerships and preferred stockholders of Simbol, both under the control of Defendant Firelake Capital Management LLC, a Delaware limited liability company headquartered in Palo Alto, California (collectively, "Firelake").[19] Firelake was founded in 2002 and invests in early-stage venture capital companies focused on cleantech and renewable energy.[20]

Non-party Itochu,[21] a preferred stockholder of Simbol, is a multinational corporation headquartered in Tokyo, Japan that operates various businesses, including importing and exporting and international trading of metals, minerals, energy, and other goods and services.[22]

B. *Facts*

---

[16] *Id.* at ¶ 15.
[17] *Id.*
[18] *Id.*
[19] *Id.* at ¶ 17.
[20] *Id.*
[21] The Plaintiffs voluntarily dismissed Itochu from this action on October 28, 2015, prior to oral argument.
[22] Compl. ¶ 19.

Simbol was founded in 2007 by Conley and Erceg, and specializes in sustainable materials technology.[23] Looking to take advantage of the increasing need for lithium in the production of electronic vehicles, Conley and Erceg developed a business model for extracting lithium and other valuable battery metals from geothermal brine using an environmentally friendly production process.[24] Simbol commenced operations in July 2008.[25]

1. The Series A Financing

In February 2008, five months before officially commencing operations, Simbol participated in the CleanTech Forum in San Francisco, California[26]—an annual gathering of clean tech entrepreneurs, venture capital firms, investors, and policy makers from around the world—where it was awarded the CleanTech Group Most Promising Technology Award.[27] While at this conference on behalf of Simbol, Conley and Erceg first met Green and began discussing a potential investment by MDV in Simbol.[28] This and subsequent conversations over the next few months culminated in Simbol's Series A round of financing.[29] The financing was led by MDV and Firelake, with other individual investors participating, and was completed

---

[23] *Id.* at ¶¶ 1, 23.
[24] *Id.* at ¶¶ 24–25.
[25] *Id.* at ¶ 26.
[26] *Id.* at ¶ 27.
[27] *Id.*
[28] *Id.* at ¶ 28.
[29] *Id.* at ¶ 29.

in July 2008, raising a total $6.7 million and resulting in a post-money valuation of Simbol of approximately $14 million.[30] With their investments, MDV and Firelake retained the right to make further investments in Simbol on a pro rata basis to prevent dilution from any later rounds of financing (the "Pro Rata Rights"), and Green became a member of the Board.[31] The funds raised in the Series A Financing were used to start the development of Simbol's processes for extracting lithium and producing lithium carbonate.[32]

2. The Series B Financing

Between July 2008 and June 2010, Simbol continued to meet and exceed operational milestones, garnering the interest of another potential investor, Itochu.[33] During the latter part of 2009, Itochu began having discussions with Simbol about making an investment in the Company,[34] and in June 2010, after months of diligence, Itochu led Simbol's Series B capital raise of $35 million—itself investing approximately $17 million—with the participation of other existing investors, including MDV and Firelake.[35]

---

[30] *Id.* at ¶¶ 30, 33. The Complaint omits the amount of each investor's contribution and the number of Series A Preferred shares held by each investor, alleging only that MDV holds the "majority" of Simbol's Series A stock. *Id.* at ¶ 30.

[31] *Id.* at ¶ 32.

[32] *Id.* at ¶ 30.

[33] *Id.* at ¶¶ 34–35.

[34] *Id.* at ¶ 35.

[35] *Id.* at ¶ 36. The Complaint does not allege the number of Series B shares held by, or the percentage of Simbol's total equity owned by, any individual investor.

At the anticipated close of the Series B financing, Simbol had a pre-money valuation of approximately $53 million.[36] Though the $35 million already raised exceeded Simbol's planned $28 million target,[37] Board members disagreed over whether to keep the financing open.[38] The Plaintiffs allege that Green and Lagod insisted that Simbol required another "venture-styled investor," and so should seek further investment,[39] while Erceg recommended to the Board that it close the Series B round.[40] Ultimately, the Series B round was extended in May 2011 with a new goal of raising $66 million in capital to support Simbol's operations.[41] This continuation of the Series B round has "extended over the past 43 months" leading up to the filing of this lawsuit, without attracting the investment capital required to close the round.[42]

### 3. The Eramet Financing

In early 2011, Eramet, S.A. ("Eramet"), a French multinational mining and metallurgy company, expressed interest in investing in Simbol.[43] After the Series B

---

[36] *Id.* at ¶ 37.
[37] *Id.* at ¶ 38.
[38] *Id.* at ¶¶ 39–40.
[39] *Id.* at ¶ 39. The Complaint alleges that Lagod and Green were "personally concerned that given the current levels of investment, Itochu would exert too much control over Simbol at MDV and [Firelake's] expense," but provides no support for this contention. *Id.* Presumably the Pro Rata Rights bargained for by MDV and Firelake in connection with the Series A financing gave them the means to prevent Itochu's investment from diluting their respective interests in Simbol.
[40] *Id.* at ¶ 38.
[41] *Id.* at ¶¶ 40, 43. In October 2012, Itochu and MDV contributed 10% of this amount, $6.6 million, at $5.50 per share. *Id.* at ¶ 85.
[42] *Id.* at ¶¶ 40, 43.
[43] *Id.* at ¶ 41.

8

round of financing was extended in May 2011, Erceg, as CEO, was directed by the Board to attempt to negotiate financing with Eramet.[44] By August, a term sheet had been negotiated, with a proposed investment by Eramet of $42 million in equity ($20.4 million at $3.50 per share and $21.6 million at $4.50 per share) and a construction loan of $50 million from Itochu (the "Eramet Financing").[45] The Plaintiffs allege that the Eramet Financing would have resulted in Simbol's post-money valuation of $180 to $240 million, "based on a series of three investment tranches," and would have been "accretive to all shareholders."[46] The Plaintiffs allege that "Eramet was the only new investor capable of making the requisite size of investment and could rapidly close [on the] final Series B investment in Simbol,"[47] and that this fact was "well known" to Green and Lagod.[48]

The Plaintiffs further allege that MDV and Firelake became concerned that Eramet would conspire with Itochu to dilute their investments in the Company, leading them to coordinate efforts to collapse the Eramet Financing.[49] By way of example, the Plaintiffs highlight that Eramet sought a right of "co-sale"[50] from all of Simbol's key investors and stockholders and that, while Green had once supported

---

[44] *Id.* at ¶ 43.
[45] *Id.* at ¶ 44.
[46] *Id.* at ¶ 46.
[47] *Id.* at ¶ 41.
[48] *Id.* at ¶ 43.
[49] *Id.* at ¶ 42.
[50] The right of "co-sale" is not further explained in the Complaint.

9

this provision, he retracted this position "so as to further undermine and prevent the closing of the Eramet financing,"[51] and because he "reasoned that MDV's own ability to achieve liquidity would be impaired."[52]

Between August and September 2011, Erceg repeatedly counseled the Board to move forward with the Eramet Financing, given Simbol's then-urgent need for additional capital.[53]  The Plaintiffs allege that Erceg's advice was met with threats from Green and MDV to "block the transaction based on their own self-interests,"[54] and a warning from Green to the Board that it should not vote for the Eramet Financing without first obtaining approval from MDV.[55]  The Plaintiffs allege that, though MDV and Firelake retained their Pro Rata Rights during this period—which would enable them to prevent any dilution resulting from an investment by Eramet— it was their fear that they would not be able to contribute equity in the future that drove their opposition to the Eramet Financing.[56]

The Complaint also describes several alleged machinations by Green to

---

[51] Compl. ¶ 42.
[52] *Id.* at ¶ 60.
[53] *Id.* at ¶¶ 48–52.  For example, the Board Book for the September 2, 2011 Board meeting, prepared by Erceg, disclosed that "[w]alking from the Eramet deals kills Simbol" and explained that the Eramet Financing "would meet the Company's Series B financing objectives and provide a runway to the Company's Series C financing for the building of a commercial plant."  *Id.* at ¶ 50.  The Complaint does not allege, however, that the Board was ever called upon to vote on any investment proposal involving Eramet.
[54] *Id.* at ¶ 48.
[55] *Id.* at ¶ 58.
[56] *Id.* at ¶ 60.

destabilize Simbol and its Board during this period. First, the Plaintiffs allege that Green sought Erceg's termination as CEO at the Board's September 15, 2011 meeting by accusing him of failing to meet certain corporate milestones.[57] Next, the Plaintiffs allege that Green "willfully manipulated the Board by arguing for a continuation of utilizing corporate funds to make progress while simultaneously act[ing] to block" any financing by Eramet.[58] Green and MDV's goal, the Plaintiffs allege, was to choke Simbol financially so that the Company would be forced to obtain additional financing from MDV under terms unfavorable to Simbol and its stockholders.[59] Finally, the Plaintiffs assert that Green orchestrated a series of events to pit Lagod against Erceg. For example, during the Eramet Financing negotiations, Green sent a proposed term sheet pursuant to which Lagod was removed from the Board, but indicated to Lagod that Erceg was behind the action.[60] This led "to immense levels of distrust amongst the members of the Board such that the board became dysfunctional" and failed to formally vote on the Eramet Financing.[61]

In October 2011, to exploit the worsening financial condition of Simbol, MDV allegedly submitted a proposal to Itochu demanding that it work with MDV

[57] *Id.* at ¶ 53. These accusations related to the timing of an initial public offering of Simbol stock and the failure to close the Series B financing. *Id.*

[58] *Id.* at ¶ 47.

[59] *Id.* I note that this argument runs contrary to MDV's alleged "fear" that lack of liquidity would prevent it from exercising its Pro Rata Rights, described above. *See supra* note 56 and accompanying text.

[60] *Id.* at ¶ 55.

[61] *Id.*

11

and Firelake to remove Erceg as CEO, wipe out the other stockholders, and invest an additional $10 million or, in the alternative, that it purchase MDV's and Firelake's equity interests for $245 million (or $635 million if certain metals were found at Simbol's production facility).[62]  By November 2011, Erceg's relationship with MDV and Firelake had deteriorated, leading Erceg to accuse MDV and Firelake of bad faith, hindering Simbol's ability to raise capital, and acting in their own self-interest rather than in the best interests of the Company.[63]

### 4. The "Extorted Rights"

The Plaintiffs allege that from late 2011 until March 2012, Green and MDV continued to act in a manner "damaging to all other shareholders," and that in March 2012, they forced the Company and other shareholders into an agreement giving MDV and Firelake more favorable terms with respect to their investments in the Company (the "Extorted Rights").[64]  These Extorted Rights were secured through the execution of "a series of corporate documents and agreements on March 13, 2012 and the filing of an Amended and Restated Certificate of Incorporation ["Amended Certificate"] for Simbol filed with the Delaware Secretary of State on the same day relating to the Proposed B2/B3/B4 Financing."[65]  Besides the Amended Certificate,

---

[62] *Id.* at ¶ 57.  The Complaint alleges that a failure to agree to either of these options would lead MDV and Firelake to "exact a recapitalization of Simbol" and to "force out all shareholders, including Itochu."  *Id.*

[63] *Id.* at ¶ 61.

[64] *Id.* at ¶ 63.

[65] *Id.* at ¶ 67.

the Complaint references two specific agreements executed on March 12, 2012 as noteable: an Amended and Restated Voting Rights Agreement and a Right of First Refusal Agreement ("ROFR").[66] Conley was party to, and voluntarily executed, both of these agreements.[67] At the time, the Board consisted of Conley, Erceg, Green, Cleveland, and Sunada.[68]

The series of agreements executed that day granted two "Extorted Rights" to MDV and Firelake. The "Put Option" granted MDV and Firelake the right to "[s]ell their stock to Simbol at their original purchase price with an eight percent (8%) simple return for a thirty (30) day[] period immediately after formal commercial operations date of the first lithium production plant."[69] The "Blocking Right" allowed MDV and Firelake to "[v]eto any financing that was valued at a pre-money valuation less than $300 million, all subsequent to an Eramet financing."[70]

The Plaintiffs allege that only after securing these rights did MDV and

---

[66] *Id.*

[67] *Id.* at ¶¶ 96, 104.

[68] *Id.* at ¶ 67. I note, however, that the Complaint subsequently alleges that the "three remaining directors" on the Board after the December 2012 resignations of Cleveland and Green were unable to act for "lack of a quorum," so presumably the Board was composed of at least six directors. *See* 8 *Del. C.* § 141(b) ("A majority of the total number of directors shall constitute a quorum for the transaction of business unless the certificate of incorporation or the bylaws require a greater number"). Additionally, the Amended and Restated Voting Rights Agreement, incorporated by reference in the Complaint, indicates that the Board was to consist of *seven* directors. *See* Itochu and Sunada Defs' Opening Br., Ex. A (the "Voting Agreement"), at § 2(e). Nonetheless, the Complaint fails to allege the size of the Board.

[69] Compl. ¶ 68.

[70] *Id.* The Complaint does not allege that MDV or Firelake attempted to exercise these alleged rights, or that the conditions precedent to their exercise ever occurred.

13

Firelake allow the Company to engage in sincere discussions with Eramet; however, by this time the original Eramet Financing deal had expired, and any subsequent deal would have to be renegotiated.[71] The Company's financial condition "continued to stress and the urgency in getting new investors increased significantly."[72] The Company began considering investments from alternative sources and approved the engagement of Byron Capital Markets Ltd. to serve as a financial advisor to Simbol.[73] Eramet, though it continued to express interest in Simbol, ultimately found that the Extorted Rights were, in Plaintiffs' words, "too complicated" and failed to close any financing.[74]

In October 2012, Itochu and MDV made a $6.6 million equity contribution at a price per share of $5.50.[75] The Plaintiffs allege that, as a requirement to close, MDV demanded additional amendments to the Extorted Rights, "whereby [Firelake] was granted the same rights though [Firelake] had not contributed to the B1, B2 or B3 rounds of financing," and that such amendments were detrimental to Simbol and its stockholders.[76]

---

[71] *Id.* at ¶ 69.

[72] *Id.* at ¶ 72.

[73] *Id.* at ¶¶ 72, 74.

[74] *Id.* at ¶¶ 74–75.

[75] *Id.* at ¶ 85.

[76] *Id.* The Complaint does not further describe this "furtherance of exacting terms" or explain how Firelake's rights changed between March and October 2012.

5. The Bridge Loans and Other Financing

In December 2011, Simbol accepted a $5 million bridge loan from Itochu (the "First Itochu Bridge") in order to delay insolvency.[77]  Then, in November 2012, Simbol began negotiations regarding another $5 million debt facility with Itochu to close by the end of the year (the "New Itochu Bridge Facility").[78]  At that time, the Company's "cash position worsened to the point of insolvency."[79]  The closing of the New Itochu Bridge Facility was delayed, however, by Cleveland's permanent and Green's apparently temporary resignations from the Board in December 2012, which left the Board without the quorum necessary to approve a financing.[80]  Due to its growing and urgent need for cash, Simbol was forced to sell approximately 80 metric tons of high purity lithium carbonate warehoused in Brawley, California to Itochu at a price roughly 50% below the market rate.[81]

The Plaintiffs allege that, sometime prior to the close of the New Itochu Bridge Facility, Itochu and MDV "unilaterally re-priced" two series of stock, the

---

[77] *Id.* at ¶ 62.
[78] *Id.* at ¶¶ 85–86.
[79] *Id.* at ¶ 79.
[80] *Id.* at ¶ 87.  The Plaintiffs allege that Green and Cleveland tendered their resignations in "an attempt to reduce their personal liability as Simbol directors and MDV's concomitant liability so that Green and Cleveland could continue to act in MDV's sole interest as a shareholder."  I note that the Complaint is internally inconsistent with respect to Green's tenure on the Board; it states here that Green resigned in December 2012, but notes elsewhere that Green served on the Board "at all material times," including in July 2013, *after* his purported resignation.  *See id.* at ¶¶ 12, 116.
[81] *Id.* at ¶ 91.

15

Series B1 Preferred and the Series B2 Preferred from $4.50 and $5.50 per share, respectively, to $3.50 per share.[82] The Plaintiffs allege that this re-pricing resulted in a loss of value of $2.00 per share and dilution, due to the issuance of further shares to account for the re-pricing.[83] Finally, the Plaintiffs assert that MDV "denied" Simbol management an opportunity to discuss the New Itochu Bridge Facility with "funding investors."[84]

The New Itochu Bridge Facility ultimately closed in March 2013.[85] The Plaintiffs allege that, in connection with this bridge facility, MDV and Itochu also entered into a side agreement, under which MDV assigned its right to select a second Board designee to Itochu, thereby "granting Itochu control of the Board" and "circumventing the Voting Agreement" entered into in March 2012, which requires the majority of common stockholders to expressly agree to any amendment of the Voting Agreement.[86]

In May 2013, Simbol again borrowed $5 million from various parties, including Itochu, MDV, Firelake, an entity called "WS Investment Company," and others, to extend the Company's operations.[87] Finally, between June and August 2013, "Simbol granted a restructuring of approximately $11.8 million in debt held

---

[82] *Id.* at ¶ 99.
[83] *Id.*
[84] *Id.* at ¶ 93.
[85] *Id.* at ¶ 97.
[86] *Id,* at ¶¶ 96–98.
[87] *Id.* at ¶ 101.

by Itochu and MDV at a 90% conversion to the current $3.50 per share conversion price," with the result that "the outstanding debt held the right to convert at $0.35 per share."[88] This transaction is not further explained in the Complaint. The Plaintiffs allege only that this debt financing "did not alleviate nor provide the needed cash to continue the operations of Simbol and, instead, placed the Company in a further precarious financial condition."[89] Additionally, the Complaint does not allege that either Itochu or MDV exercised this alleged right to convert debt to equity, and does not seem to bring a claim for relief on this ground.

### 6. The Erceg Settlement and Right of First Refusal

In March 2012, Simbol and certain investors—including MDV, Itochu, Firelake, Erceg, and the Plaintiffs—executed a Right of First Refusal Agreement (the "ROFR") in connection with the Proposed B2/B3/B4 Financing.[90] Pursuant to the ROFR, any investor transferring Simbol shares must provide advance written notice of the transfer, and then "Significant Holders," defined to include the Plaintiffs, "shall have the right to purchase a portion of the Offered Shares equal to such Significant Holders' ROFR Pro Rata Portion . . . ."[91] Section 5 of the ROFR provides that "[a]ny attempt by any Seller to Transfer any Shares in violation of any

---

[88] *Id.* at ¶ 102.
[89] *Id.* at ¶ 103.
[90] *Id.* at ¶ 104.
[91] *Id.* at ¶¶ 105–06.

17

provision of this Agreement will be void."[92]

The Plaintiffs allege that, due to the actions of MDV and Green (not further described in the Complaint), Erceg was forced to resign as CEO and Director of Simbol in January 2013.[93] In July 2013, Simbol settled claims (also undescribed) asserted by Erceg (the "Erceg Settlement").[94] At least Sunada, Nishio, and Green allegedly sat on the Board at the time.[95] As a part of the settlement, Erceg transferred his 2,109,468 shares of Simbol common stock (the "Erceg Shares") back to the Company, but neither he nor Simbol provided a transfer notice to the Plaintiffs.[96] The Plaintiffs assert that, because they did not receive a transfer notice from the investor, as required under the ROFR, the transfer was void.[97] They assert further that this failure to act in accordance with the ROFR was part of a larger scheme to defraud key common stockholders, including the Plaintiffs, of "special rights and economic benefits."[98] The Plaintiffs insist that they are *not* "asserting a claim for breach of contract against any party," but rather are alleging that the breach of the

---

[92] *Id.* at ¶ 107.
[93] *Id.* at ¶ 94.
[94] *Id.* at ¶ 108. The bases of Erceg's claims against Simbol are not identified and are allegedly confidential pursuant to the terms of the Erceg Settlement. *See* Oral Argument Tr. 59:3–18.
[95] Compl. ¶ 116. I note again, however, that it is unclear, based on the Complaint, whether Green or others sat on the Board in January 2013. *See supra* notes 68, 80.
[96] Compl. ¶ 108.
[97] *Id.* at ¶ 109.
[98] *Id.* at ¶ 112.

ROFR is relevant to "the Defendants' scheme to breach their fiduciary duties."[99]

Also in connection with the Erceg Settlement, "Itochu and MDV made equity contributions or conversion notes in Simbol."[100] The Plaintiffs allege that these equity contributions "further diluted Plaintiffs' ownership interest in Simbol which could have been averted had the parties settled the claims individually."[101]

### 7. Issuance of Shares to Burba

Erceg's replacement, John Burba, was hired at some time in or before April 2013.[102] Burba holds approximately 2,274,200 common shares of Simbol, of which 174,200 were granted "as a result of activities related to the licensing of technology to Simbol prior to Burba's appointment as CEO."[103] The remaining approximately 2,100,000 shares that Burba was granted, the Plaintiffs stress, almost exactly equals the number of shares that were transferred by Erceg back to Simbol as a part of the Erceg Settlement, which are described as "void" immediately upon their transfer.[104]

---

[99] *Id.* at ¶ 109 n.1. At Oral Argument, the Plaintiffs conceded that the duty to provide notice of the transfer under the ROFR rested with Erceg, and not Simbol, but argued that, because the Defendants *knew* there was a right of first refusal that should have been offered to Conley, they breached their fiduciary duties by not "proceed[ing] according to the contract, in furtherance of [their] scheme to dilute Mr. Conley and to minimize his voting power." Oral Argument Tr. 63:13–20.

[100] Compl. ¶ 116.

[101] *Id.* No further information is provided about the magnitude, circumstances, or effect of these equity contributions.

[102] *Id.* at ¶ 100.

[103] *Id.* at ¶ 110.

[104] *Id.* I note that it would be the transaction, not the shares of stock, which arguably became void due to Erceg's contractual breach. There is no allegation identifying when Burba received these shares, though he must have received them prior to August 9, 2013, the date on which Burba voted the shares in favor of his appointment to the Board. *See id.* at ¶ 115.

The Complaint treats the 2.1 million shares Burba received as if they were the Erceg Shares—though it never expressly states as much—by, for example, alleging that the shares issued to Burba were void for Erceg's failure to comply with the ROFR, and that the "entire scheme to ultimately put *those* shares in Burba's hands evidenced a conspiracy to defraud common stockholders, including the Plaintiffs."[105] Burba was placed on the Board by a written consent of the common stockholders dated August 9, 2013, which consent was based necessarily on Burba voting his own shares in favor of his appointment to the Board.[106] This action was taken, the Plaintiffs allege, despite the fact that Burba knew the written consent relied upon the "void" Erceg Shares, and therefore was an improper, *ultra vires* act by the Company.[107]

The Plaintiffs allege that Simbol transferred these 2,100,000 shares to Burba to help "effect a change in control of the majority common voting structure beneficial to the preferred shareholders at the expense of key common stockholder[s] including Plaintiffs."[108] Finally, the Plaintiffs assert that the failure to act in accordance with the ROFR was part of a conspiracy to improperly enrich and empower Burba without regard to the rights of Simbol stockholders.[109]

---

[105] *See id.* at ¶ 112 (emphasis added).
[106] *Id.* at ¶ 115.
[107] *Id.*
[108] *Id.* at ¶ 111.
[109] *Id.* at ¶ 112.

20

## 8. Other Factual Allegations

The Complaint contains various other factual allegations that are not easily linked to the alleged damages to the Plaintiffs. For example, the Plaintiffs allege that between July and August of 2012, Green caused "executive insubordination" by encouraging Simbol's Vice President of Business Development to pursue financing from DuPont.[110] The Plaintiffs also allege that the Board failed to perform proper due diligence in hiring Burba as CEO, pointing to his previous performance results at Molycorp, Inc. prior to joining Simbol.[111] They allege that Itochu thwarted potential investments in Simbol by Chinese firms that held dominant positions in the Chinese lithium market relative to Itochu.[112] And, finally, the Plaintiffs allege conflicts of interest of the Company's outside corporate counsel, who are not parties to this action.[113]

### C. Procedural History

The Plaintiffs filed a Verified Complaint on February 2, 2015 asserting (1) a breach of fiduciary duty claim against the Director Defendants and MDV;[114] and (2) aiding and abetting a breach of fiduciary duty claim against Firelake, Itochu, and MDV. In response, the Defendants filed four Motions to Dismiss, and full briefing

---

[110] *Id.* at ¶¶ 76–77.
[111] *Id.* at ¶ 114.
[112] *Id.* at ¶¶ 81–83.
[113] *Id.* at ¶¶ 118–22.
[114] To the extent the Complaint purports to plead a breach of duty claim against Simbol itself, it must be dismissed; Simbol does not owe any Plaintiff fiduciary duties.

21

of the motions followed.  I heard oral argument on October 28, 2015 (the "Oral

Argument"), at which time I reserved judgment.  This Opinion resolves those

motions.

## II. STANDARD OF REVIEW AND STANDING

The standard of review under Court of Chancery Rule 12(b)(6) is well-settled.

The Court will grant a motion to dismiss for failure to state a claim where the

complaint does not assert sufficient facts that, if proven, would entitle the plaintiff

to relief.[115]  In its analysis, the Court must

> accept all well-pleaded factual allegations in the Complaint as true,
> accept even vague allegations in the Complaint as "well-pleaded" if
> they provided the defendant notice of the claim, draw all reasonable
> inferences in favor of the plaintiff, and deny the motion unless the
> plaintiff could not recover under any reasonably conceivable set of
> circumstances susceptible of proof.[116]

However, the Court need not "accept conclusory allegations unsupported by specific

facts or . . . draw unreasonable inferences in favor of the non-moving party."[117]

The Complaint surveys the actions of the parties over the course of an almost

eight-year period, spanning the formation of the Company, its financing, the

beginning of its financial woes, and the installation of a new CEO.  The Complaint

---

[115] *Lucas v. Hanson*, 2014 WL 7235462, at *2 (Del. Ch. Dec. 19, 2014).

[116] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011) (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[117] *Price v. E.I. duPont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent–A–Car Co.*, 977 A.2d 892, 895 (Del. 2009)).

then asserts two counts—one for breach of fiduciary duty against the Director Defendants and MDV; and the other for aiding and abetting a breach of fiduciary duty against Firelake, Itochu, and, in the alternative to Count I, against MDV— seeking in relief an accounting to the Plaintiffs for "all damages suffered and to be suffered by [the Plaintiffs] as a result of the wrongs complained of," and costs of the action.

In Count I of the Complaint, the Plaintiffs list twelve ways in which MDV and the Director Defendants allegedly breached their fiduciary duties, primarily concerning three events: the Company's efforts to obtain financing from Eramet in or around May 2011 through April 2012; the March 2012 adoption of the Amended and Restated Certificate of Incorporation and related documents, which the Plaintiffs have termed the "Extorted Rights"; and the Erceg Settlement and issuance of shares to Burba. In their respective Motions to Dismiss, the Director Defendants, MDV, and Firelake argue that the Plaintiffs' claims are derivative in nature and that, as the Plaintiffs have neither sought corrective action from the Company nor pled demand futility, the Complaint should be dismissed for failure to comply with Court of Chancery Rule 23.1.[118] The Plaintiffs have insisted, however, that they seek relief

---

[118] Court of Chancery Rule 23.1 imposes "stringent requirements of factual particularity" on a plaintiff pursuing a derivative suit, *Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000), requiring the plaintiff to "allege with particularity the efforts, if any," made to obtain corrective action from the corporation "and the reasons for the plaintiff's failure to obtain the action or for not making the effort," Ct. Ch. R. 23.1. The plaintiff must show, with particularity, that demand on the board to take corrective action was either wrongfully refused or futile. *White v. Panic*, 783 A.2d 543, 550

*only* for direct harm to them.[119]

Under Delaware law, whether a claim is derivative or direct "turn[s] solely on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)."[120] "Although each question is framed in terms of exclusive alternatives (*either* the corporation *or* the Stockholders), some injuries affect *both* the corporation *and* the stockholders" and in such a case, the plaintiffs may choose to sue individually.[121]

Claims based on the diminution in value of the stock held by plaintiffs are generally derivative in nature.[122] However, the Delaware Supreme Court recognized a limited exception to this rule—on which the Plaintiffs rely here—in *Gentile v. Rossette*.[123] Recognizing the "dual character of dilutive issuances,"[124] the Court held in *Gentile* that "[t]here is . . . at least one transactional paradigm—a species of corporate overpayment claim—that Delaware case law recognizes as being both

---

(Del. 2001).

[119] *See* Oral Argument Tr. 9:10–12 ("We are pursuing [the claims] as direct. We are not arguing—we're not arguing that demand is excused.").

[120] *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004) (emphasis in original).

[121] *Carsanaro v. Bloodhound Tech., Inc.*, 65 A.3d 618, 655 (Del. Ch. 2013) (citations omitted).

[122] *See Feldman v. Cutaia*, 951 A.2d 727, 733 (Del. 2008) ("Where all of a corporation's stockholders are harmed and would recover *pro rata* in proportion with their ownership of the corporation's stock solely because they are stockholders, then the claim is derivative in nature.").

[123] 906 A.2d 91 (Del. 2006).

[124] *Carsanaro*, 65 A.3d at 657.

derivative and direct in character."[125]  The Court explained:

> A breach of fiduciary duty claim having this dual character arises where: (1) a stockholder having majority or effective control causes the corporation to issue "excessive" shares of its stock in exchange for assets of the controlling stockholder that have a lesser value; and (2) the exchange causes an increase in the percentage of the outstanding shares owned by the controlling stockholder, and a corresponding decrease in the share percentage owned by the public (minority) shareholders. Because the means used to achieve that result is an overpayment (or "over-issuance") of shares to the controlling stockholder, the corporation is harmed and has a claim to compel the restoration of the value of the overpayment. That claim, by definition, is derivative.
> But, the public (or minority) stockholders also have a separate, and direct, claim arising out of that same transaction. Because the shares representing the "overpayment" embody both economic value and voting power, the end result of this type of transaction is an improper transfer—or expropriation—of economic value and voting power from the public shareholders to the majority or controlling stockholder. For that reason, the harm resulting from the overpayment is not confined to an equal dilution of the economic value and voting power of each of the corporation's outstanding shares. A separate harm also results: an extraction from the public shareholders, and a redistribution to the controlling shareholder, of a portion of the economic value and voting power embodied in the minority interest. As a consequence, the public shareholders are harmed, uniquely and individually, to the same extent that the controlling shareholder is (correspondingly) benefited. In such circumstances, the public shareholders are entitled to recover the value represented by that overpayment—an entitlement that may be claimed by the public shareholders directly and without regard to any claim the corporation may have.[126]

This Court has suggested that, under this limited exception, standing will exist "if a

---

[125] *Gentile*, 906 A.2d at 99.
[126] *Id.* at 99–100.

25

controlling stockholder [stands] on both sides of the transaction," or "if the board that effectuated the transaction lacked a disinterested and independent majority."[127] However, standing will *not* exist "if there is no reason to infer disloyal expropriation, such as when stock is issued to an unaffiliated third party, as part of an employment compensation plan, or when a majority of disinterested and independent directors approves the terms."[128] That is, "[t]he expropriation principle operates only when defendant fiduciaries (i) had the ability to use the levers of corporate control to benefit themselves and (ii) took advantage of the opportunity."[129]

The Plaintiffs acknowledged at the Oral Argument that the alleged wrongful acts leading up to the Erceg Settlement are derivative in nature, but insist that these acts are nonetheless significant as evidence of an overarching "scheme" to bring Simbol to the brink of disaster, which scheme ultimately resulted in the direct harm for which the Plaintiffs now seek relief.[130] Because of the atypical way in which this

---

[127] *Carsanaro*, 65 A.3d at 658.

[128] *Id.*

[129] *Id.* at 658–59.

[130] *See* Oral Argument Tr. 68:13–20 (The Court: "Your argument is these investors were fiduciaries for the company who engaged in the scheme and used their power over a period of years to advance their own interest, to the detriment of the company and its stockholders, and that entire scheme and its execution is what is the breach of duty, the actionable breach of duty? Plaintiffs' Counsel: "Yes, Your Honor."); *id.* at 69:1–4 (Plaintiffs' Counsel: "So I will say that up until the Erceg settlement, there are breaches of fiduciary duty. They are derivative in nature. What changes is with the Erceg settlement. Now, I think an argument can be made that some of the acts prior to the Erceg settlement could be—could be direct claims. I'm not—I don't even have to go there for purposes of today, or in the future.").

Complaint was drafted[131]—and the slew of breaches of fiduciary duty alleged in the Complaint that the Plaintiffs have conceded are derivative in nature—the direct harm allegedly suffered by the Plaintiffs is quite difficult to discern from the face of the Complaint. The Plaintiffs clarified at Oral Argument, however, that the direct harm to the Plaintiffs allegedly resulted from: (1) the re-pricing of shares by Itochu and MDV, and (2) the Erceg Settlement and the issuance of shares to Burba.[132] I therefore examine these two transactions for breaches of fiduciary duty, in light of the overarching factual history pled.[133]

### III. ANALYSIS

Before turning to the relief sought, I first consider those causes of action notably *not* asserted here for relief. The Complaint alleges that Erceg violated the

---

[131] Unlike the typical complaint alleging a breach of fiduciary duty by a company's board members—which would center on a particular transaction, and the various board members' failures to satisfy their fiduciary duties with respect to that transaction—the Complaint here suggests that it is a scheme to advance the Defendants' interests, consisting of events over a period of years, that caused actionable detriment to Simbol and the Plaintiffs' interests.

[132] Oral Argument Tr. 69:9–18 ("Where the direct harm comes into play is when MDV begins to effectuate its plan to rid themselves of the founders, and did it with Erceg and with the settlement. . . . They bring in Burba to replace Erceg, an MDV guy. You know, selected by MDV. And that's where the direct harm begins to take place, when they transfer the 2.1 million shares."); *id.* at 74:2–9 ("And the only other element of the direct harm related to the transaction, as alleged in the complaint, is the repricing of the stock in early 2013. Again, this was all around the same time, in 2013, when MDV and Itochu repriced shares, issued it to themselves at $2.50 a share when the stock had been priced at $4.50 and 5.50 a share.").

[133] Because, prior to the Plaintiffs' clarification at Oral Argument, they seemed to be alleging actionable breaches of duty pre-dating the Erceg Settlement of 2013, the briefing concentrated heavily on the defenses of laches, waiver, and acquiescence with regard to these earlier transactions. Because the Plaintiffs now concede that these earlier transactions give rise only to claims on behalf of the Company, for which they do not seek redress, I have not considered the defenses described in this footnote further.

27

ROFR agreement, giving the Plaintiffs a contract claim against Erceg, but they have chosen not to pursue that claim here. They also allege what appears to be intentional interference with that contract right, by various Defendants, but have specifically eschewed pursuing a recovery in contract, or specific performance of the contract. Finally, they have alleged many actions they describe as breaches of duty to the Company, by a controller and a captured Board, but they have forgone a derivative action in vindication of those wrongs, choosing instead to pursue a pair of direct dilution claims. With that in mind, I turn to the analysis of those claims the Plaintiffs have chosen to present.

### A. Re-pricing of Simbol Stock

The first instance of alleged direct harm for which the Plaintiffs seek relief is the "re-pricing" of Simbol Stock. The Plaintiffs allege only that,

> [p]rior to the closing of the New Itochu Bridge Facility, Itochu and MDV colluded to re-price the company stock in a self-interested and dilutive transaction at the expense of the Company's other shareholders. Itochu and MDV unilaterally re-priced two series of stock, the Series B1 Preferred and the Series B2 Preferred from $4.50 and $5.50 per share, respectively, to $3.50 per share. This action described in the Exchange Agreement ("Exchange") favored Itochu and MDV exclusively and was presented under the auspices of an inducement to invest. The control of Simbol's Board granted the re-pricing that resulted in a loss of value of $2.00 per share, and dilution due to the issuance of further shares to account for the re-pricing.[134]

---

[134] Compl. ¶ 99. With respect to the relief sought, the complaint is similarly non-specific; it seeks accounting for "all" damages, incurred or future, arising from all allegations of wrongdoing.

The New Itochu Bridge Facility "concluded in March 2013," indicating that the re-pricing occurred at some time between January and March 2013. The Complaint references Board action but does not explain when that Board meeting took place. At Oral Argument, the Plaintiffs clarified that this claim should be treated as direct because "they diluted Mr. Conley's value of the stock by issuing—repricing and issuing themselves stock at a significantly discounted amount."[135]

Under Delaware law, at the motion to dismiss stage of a proceeding, the Court must deny the motion unless, drawing all reasonable inferences in favor of the plaintiff, the plaintiff could not recover under "any *reasonably conceivable* set of circumstances susceptible of proof."[136] For the "reasonableness" part of the standard to have meaning, a complaint, in this context, that omits necessary facts available pre-discovery to a plaintiff—relying instead on mere conclusory assertions—cannot survive a motion under Rule 12(b)(6).[137] I find that this claim for relief is properly dismissed under the "reasonable conceivability" standard, as the Complaint alleges insufficient facts to allow me to both understand the claim being asserted and to conclude that, assuming those facts as true, Simbol was controlled by MDV or that a majority of the Directors lacked independence or disinterest with respect to the

---

[135] Oral Argument Tr. 74:13–15.

[136] *Central Mortg. Co.*, 27 A.3d at 537 (citing *Savor*, 812 A.2d at 896–97) (emphasis added).

[137] *See generally In re Morton's Restaurant Grp., Inc. S'holders Litig.*, 74 A.3d 656 (Del. Ch. 2014) (finding that conclusory allegations of the exercise of actual domination and control by minority stockholder insufficient to withstand motion to dismiss under Rule 12(b)(6)).

repricing.

A factually sparse Complaint such as this—"sparse" in the sense that it omits many pertinent facts, which presumably were available to stockholders, leaving the Court to speculate as to these facts or attempt to supply them through conclusory allegations—in essence invites the Court to both state a claim and then analyze it. I presume that the claim runs as follows: MDV, as controlling stockholder, controlled the corporate machinery of Simbol with respect to the pricing of certain series "B" offerings, and conspired with Itochu to use that machinery to create and reap the benefit of an option to purchase preferred shares below market price. Finally, these actions resulted in the issuance of additional shares to acquire the financing undertaken in the offering, diluting the interest of the Plaintiffs. If this is in fact the Plaintiffs' claim, the Plaintiffs have properly asserted it as a direct claim;[138] to find that such a cause of action has been adequately pled, however, would require me to assume the existence of many facts not alleged in the Complaint. The Complaint, for example, is silent as to precisely when the alleged re-pricing took place. The Complaint does indicate that the Board membership and size were in flux throughout this period. It does not provide how many Board members were authorized by

_____

[138] *See generally Gentile*, 906 A.2d 91. Of course, the same scenario presents a wrong to the Company, which a stockholder could pursue derivatively as well.

Simbol's bylaws, or who sat on the Board at the time of the re-pricing.[139] It fails to disclose whether the decision to allow the re-pricing was put to a vote of the Board, and if so, how the Directors voted. Conversely, if the re-pricing was done pursuant to a contractual right held by MDV, the Complaint omits to state when the Board granted that right, and why that decision was wrongful. In addition, the Complaint fails to explain the relationship between the various classes of shares,[140] or how the re-pricing was dilutive to the common stockholders, among other facts that would aid my analysis.[141]

Most critically, the Plaintiffs have failed to allege facts that, if true, demonstrate that MDV is a controlling stockholder, and without such a showing, MDV cannot be held liable for a breach of fiduciary duty under Count I. Under Delaware law, a "shareholder owes a fiduciary duty only if it owns a majority interest in or exercises control over the business affairs of the corporation."[142] "A shareholder will be considered 'controlling' if it either owns more than 50% of the

---

[139] The Complaint alleges only that the re-pricing took place prior to the close of the New Itochu Bridge Facility in March 2013. Compl. ¶¶ 97, 99; Oral Argument Tr. 74:2–9. From my examination of the Complaint, I assume that Green and Sunada sat on the Board during this whole time period, but it is unclear if the Board also included Ericson, Nishio, or both, as well. I note, again, that the Complaint suggests that the number of directors called for by the Company's bylaws is at least six, and that the Voting Agreement suggests that the Board had seven seats. *See supra* note 68.

[140] These facts would aid in a determination of whether, for example, an additional issuance of preferred shares had a substantial or merely *de minimis* effect on the Plaintiffs' ownership interests in Simbol.

[141] I list these factual lacunae not to imply that any one alone is a fatal defect, but to put what is pled in context.

[142] *Ivanhoe Partners v. Newmont Mining Corp.,* 535 A.2d 1334, 1344 (Del. 1987).

voting power of the company, or exercises 'actual control' over the board of directors during the course of a particular transaction."[143]  With respect to the control requirement, "[t]he bare conclusory allegation that a minority stockholder possessed control is insufficient."[144]  Rather, "the Complaint must contain well-pled facts showing that the minority stockholder 'exercised actual domination and control over . . . [the] directors.'"[145]  To survive a motion to dismiss, these facts must "demonstrat[e] actual control with regard to the particular transaction that is being challenged."[146]

The Complaint does not allege that MDV holds a majority of the shares.  It alleges only that MDV "held and controlled a majority of Simbol's *Series A preferred stock*."[147]  As the Complaint is silent as to the relationship between the Series A and other classes of stock, and to the voting rights of each, there is no allegation or reasonable inference that MDV was a majority stockholder.  Therefore, I can only find that MDV owed a fiduciary duty if I determine that it exercised control over the corporate machinery with respect to the transaction at issue.

The focus of that analysis is on allegations of *actual control*—not merely

---

[143] *Zimmerman v. Crothall*, 62 A.3d 676, 699–700 (Del. Ch. 2013) (citations omitted).
[144] *Morton's Rest. Grp.*, 74 A.3d at 664–65 (citation omitted).
[145] *Id.*
[146] *In re KKR Fin. Holdings LLC S'holder Litig.*, 101 A.3d 980, 991 (Del. Ch. 2014).
[147] Compl. ¶ 15 (emphasis added).

*potential control.*[148] This prong applies only to stockholders "who, although lacking a clear majority, have such formidable voting and managerial power that they, as a practical matter, are no differently situated than if they had majority voting control."[149] "[T]he minority blockholder's power must be so potent that independent directors . . . cannot freely exercise their judgment . . . ."[150] Without allegations regarding the number of directors at the time of the transaction, their identity, facts showing control by MDV, and details regarding the terms of the transaction itself, I am unable to find sufficient allegations that MDV controlled the corporate machinery and used it to enrich itself.[151]

The Plaintiffs do not rely on specific allegations of control of the corporate machinery here; instead, they point to MDV's contractual rights as providing leverage over the company. They assert that that MDV acquired "blocking rights" in connection with its Series A preferred stock, and that such blocking rights "put MDV in a controlling position over the Company."[152] Under Delaware law, however, contractual rights held by a non-majority stockholder do not equate to control, even where the contractual rights allegedly are exercised by the minority

---

[148] *See In re Sea-Land Corp. S'holders Litig.*, 1987 WL 11283, at *5 (Del. Ch. May 22, 1987) ("As this Court has previously recognized, the *potential* ability to exercise control is not equivalent to the actual *exercise* of the ability.") (citation omitted) (emphasis in original).

[149] *In re PNB Holding Co. S'holders Litig.*, 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006).

[150] *Morton's Rest. Grp.*, 74 A.3d at 665 (citation omitted).

[151] The Complaint does specifically allege that Green was a fiduciary for MDV, and thus had divided loyalties. It makes conclusory allegations about other directors, as well.

[152] Compl. at ¶ 8.

33

stockholder to further its own goals. For example, in *Superior Vision Servs., Inc. v. ReliaStar Life Ins. Co.*[153] an investor company, ReliaStar, a 44% stockholder, was accused of breaching controlling-stockholder fiduciary duties because it exercised a contractual right in a stock purchase agreement to block the corporation, SVS, from paying dividends.[154] Despite the plaintiff's allegation that ReliaStar withheld its consent in bad faith "in order to strong-arm individual stockholders or SVS to further its own agenda," this Court dismissed the breach of fiduciary duty claim, holding that the Court would not impose additional duties on ReliaStar that had not been negotiated in the contract, and that ReliaStar's contractual rights did not transform it into a "controlling shareholder."[155] That is, a stockholder does not become a controlling stockholder merely by "exercise[ing] a duly-obtained contractual right that . . . limits or restricts the actions that a corporation otherwise would take."[156] The Plaintiffs here have alleged the existence of a contractual right, which permitted MDV to restrict corporate action, thus giving it leverage over the Board. Holding, even exercising, this right does not make MDV a controller owing fiduciary duties to the Plaintiffs.[157]

---

[153] 2006 WL 2521436 (Del. Ch. Aug. 25, 2006).
[154] *Id.* at *1–2.
[155] *Id.* at *1, *5.
[156] *Id.* at *5.
[157] The Complaint does not allege that MDV controlled the Board at the time the blocking rights were granted. The Complaint alleges that the Board consisted of Plaintiff Conley together with Erceg, Green, Cleveland, and Sunada at this time. Compl. ¶ 67. Green and Cleveland are the only two members of the Board who are alleged to have any connection to MDV.

Put another way, a stockholder who—via majority stock ownership or through control of the board—operates the decision-making machinery of the corporation, is a classic fiduciary; in controlling the company he controls the property of others— he controls the property of the non-controlling stockholders. Conversely, an individual who owns a contractual right, and who exploits that right—even in a way that forces a reaction by a corporation—is simply exercising his own property rights, not that of others, and is no fiduciary.

It is, of course, conceivable that MDV was a fiduciary controller at the time of the re-pricing transaction, assuming it had achieved control or influence over a majority of directors through non-contractual means, such as affiliation or aligned self-interest. If such had been adequately pled, the burden would be on MDV and those directors to establish the entire fairness of the transaction. It is not *reasonably* conceivable, however, based upon the non-conclusory facts pled, that such control in fact existed. The Complaint is simply insufficient in this regard.

To the extent these allegations also attempt to assert a claim against the Director Defendants sitting on the Board at the time of the re-pricing, this claim fails as well. Under Delaware law, the business judgment rule establishes a "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best

35

interests of the company."[158]  This presumption can be rebutted if the plaintiff "shows that the directors breached their fiduciary duty of care or of loyalty or acted in bad faith."[159]  The allegation that a director was appointed by a stockholder to the board, alone, is not enough to defeat this presumption.[160]  Green and Ericson, through their positions as both general partners of MDV and members of the Simbol Board, had dual loyalties to Simbol and MDV.  However, without knowing the complete composition of the Board at the time of the alleged re-pricing,[161] I cannot determine the effect of those dual loyalties—that is, whether a *majority* of the Directors were not independent and disinterested.

Thus, because the Plaintiffs have failed to include key facts, including those which, if true, demonstrate that MDV was a controlling stockholder with respect to the re-pricing transaction or that a majority of the directors involved with the re-pricing were not independent and disinterested, I dismiss this claim in Count I as to MDV and, to the extent these allegations assert a claim against various Directors, as to those Director Defendants as well.

I note that the Plaintiffs, in their papers and at Oral Argument, relied heavily

---

[158] *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled in part on other grounds by Bream v. Eisner*, 746 A.2d 244, 253 (Del. 2000).
[159] *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 52 (Del. 2006).
[160] *See In re W. Nat. Corp. S'holders Litig.,* 2000 WL 710192, at *15 (Del. Ch. May 22, 2000) ("The fact that a company's executive chairman or a large shareholder played some role in the nomination process should not, without additional evidence, automatically foreclose a director's potential independence.").
[161] *See supra* note 139.

on this Court's decision in *Carsanaro v. Bloodhound Technologies, Inc.*[162]  To me,

however, the depth of pleading here stands in stark contrast to that in *Carsanaro*.

The action in *Carsanaro* was brought by a founder, common stockholder, and former

CEO of Bloodhound Technologies, Inc., Mr. Carsanaro.  After two rounds of venture

capital financing, Carsanaro was ousted as CEO and removed from board.  Three

more rounds of financing followed, the terms of which were not shared with

Carsanaro, and which were conducted without contacting third parties or canvassing

the market.  In connection with the final round of financing, an investor proposed to

purchase 30,000,000 shares of preferred stock.  To keep the conversion rights of this

preferred stock equivalent, the company's directors approved a 10-for-1 reverse split

of the company's outstanding common stock and filed an amended and restated

charter authorizing the preferred shares.  In so doing, the board did not adjust the

conversion prices of the earlier rounds of preferred shares to account for the reverse

split, thereby making the conversion rights for the newest shares ten times more

valuable than those held by the founders.  The company then entered into separate

agreements with certain other investors to protect them from the dilution.  When the

company was ultimately acquired, the Plaintiffs learned, for the first time, that as a

result of the several rounds of financing and the failure to adjust the preferred stock

conversion prices in connection with the reverse split, that the aggregate ownership

---

[162] 65 A.3d 613 (Del. Ch. 2013).

interest of all the common stockholders had been diluted significantly.

The Court, in addressing the plaintiffs' claims regarding the final two rounds of financing, found that the plaintiffs had overcome the business judgment rule's presumption of loyalty by alleging facts supporting a reasonable inference that there were not enough independent and disinterested individuals among the directors making the decision to comprise a board majority. The Court also found that the plaintiffs had properly asserted a claim that the Company did not comply with the statutory requirements of Sections 242(b)(1) and 228 of the DGCL in adopting the reverse split and amended and restated charter. The Court then held that these claims were not barred by laches, though brought outside the analogous statute of limitations period, because the terms of the financings and the reverse stock split were either not publicly available or not available to a stockholder exercising reasonable diligence. It was only after the sale of the company, the Court held, that the series of fiduciary breaches became apparent to the plaintiffs and other common stockholders.

The case before me now is distinct from *Carsanaro* on several key grounds. In *Carsanaro*, the plaintiffs identified discrete actions that were taken by the board that caused dilution—the various rounds of financing after the founders were ousted from the board, and the reverse stock split—and pled the directors involved in each interested transaction and facts which, if true, demonstrated that they were

controlled. Conversely, here, it is impossible for me to determine the complete composition of the Board at the time of the alleged direct harms, or even the number of directors composing the Board. Just as fundamentally, as discussed above, the Plaintiffs have failed to plead sufficient facts surrounding the alleged dilutive direct harm—there is nothing which, if true, demonstrates that sufficient re-priced shares were taken up, compared with those authorized before the re-pricing, so as to cause dilution of the Plaintiffs' holdings. The Plaintiffs appear to rely on the purported "scheme" of MDV to oust the Company's ownership, bring the Company to the brink of disaster, then wrest control for itself, as a means of lowering their pleading burden regarding the distinct, direct harms for which they seek relief.[163] However, the Court's recognition of an overarching series of events that ousted the founders in *Carsanaro* did not lessen the plaintiffs' pleading burden; the Court analyzed the composition and decision-making of the board with respect to each series of financing alleged to have constituted a breach of fiduciary duty, finding only that the lack of transparency to the common stockholders regarding the board's actions in

---

[163] *See* Oral Argument Tr. 78:16–21 ("It's a series of events. It's not 'Here's the action.' It is a series of actions that led to the ultimate knife, and in Carsanaro it was the sale of the company. In this case, Your Honor, it's the Erceg settlement leading to the Burba shares, which diluted the plaintiff's."); *id.* at 68:9–20 ("So just so I understand, there's no discrete act here that you're able to say to me, 'This is a controlling shareholder using its rights to enter or do some transaction or deal that has caused damage to the company.' Your argument is these investors were fiduciaries for the company who engaged in the scheme and used their power over a period of years to advance their own interest, to the detriment of the company and its stockholders, and that the entire scheme and its execution is what is the breach of duty, the actionable breach of duty?" "Yes, Your Honor.").

this series of transactions weighed in favor of equitable tolling of the statute of limitations analogous to the laches defense. Here, conclusory allegations of a "scheme" are insufficient, and do not excuse the Plaintiffs from their burden of properly stating a claim upon which relief may be granted.

### B. The Erceg Settlement and the Issuance of Shares to Burba

I turn next to the allegations surrounding the Erceg Settlement and the subsequent issuance of shares to Burba,[164] which the Plaintiffs urge me to consider as one dilutive transaction. The Plaintiffs have alleged that, "[o]n March 13, 2012, Simbol and certain investors, including MDV, Itochu, [Firelake], Erceg and Plaintiffs, executed a Right of First Refusal Agreement . . . in connection with the SPA (the Proposed B2/B3/B4 Financing)."[165] Under the terms of this agreement, "a transferring investor was required to provide advance written notice of a transfer of Simbol shares (the "Transfer Notice"),"[166] and "Significant Holders"—defined to include Plaintiffs—"shall have the right to purchase a portion of the Offered Shares equal to such Significant Holders' ROFR Pro Rata Portion on the same terms and conditions as specified in the Transfer Notice."[167] Section 5 of the ROFR provides that "[a]ny attempt by any Seller to Transfer any Shares in violation of any provision

---

[164] *See id.* at 69:9–12 ("Where the direct harm comes into play is when MDV begins to effectuate its plan to rid themselves of the founders, and did it with Erceg and with the settlement.").
[165] Compl. ¶ 104.
[166] *Id.* at ¶ 105.
[167] *Id.*

40

of this Agreement will be void."[168]

"In July 2013, Simbol settled claims asserted by Erceg (the "Erceg Settlement")," pursuant to which Erceg transferred his approximately 2,108,468 shares of Simbol common stock (the "Erceg Shares") back to Simbol.[169] At the time, the Board consisted of Sunada, Nishio, and Green.[170] No other facts surrounding the Erceg Settlement are alleged,[171] except that, as a part of the Erceg Settlement, "Itochu and MDV made equity contributions or conversion notes in Simbol to settle the claims," which contributions "further diluted Plaintiffs' ownership interest in Simbol which could have been averted had the parties settled the claims individually."[172] The Plaintiffs allege that, in transferring his shares pursuant to the Erceg Settlement, "Erceg had an obligation under the ROFR to inform Plaintiffs of the transfer of his shares in sufficient detail to permit Plaintiffs time to contemplate exercising their rights to purchase, on a pro rata basis, their interest of the Erceg Shares."[173] They assert that, "[d]espite the failure to give Plaintiffs notice under the ROFR, Erceg and Simbol closed the sale of the Erceg Shares" and that, "[b]ecause Plaintiffs did not receive a Transfer Notice as required, the transfer was, by operation

---

[168] *Id.* at ¶ 107.
[169] *Id.* at ¶ 108.
[170] *Id.* at ¶ 116. *But see supra* note 68.
[171] The bases of Erceg's claims against Simbol are not identified and are allegedly confidential pursuant to the terms of the Erceg Settlement. *See* Oral Argument Tr. 59:3–18.
[172] Compl. ¶ 116.
[173] *Id.* at ¶ 109.

of the ROFR, void."[174]

The Plaintiffs further allege that, due to the actions of MDV and Green, Erceg was forced to resign as CEO and Director of Simbol in January 2013,[175] and that "[b]y April 2013 . . . the Board had recently hired a new CEO, John Burba."[176] "Burba holds approximately 2,274,200 common shares of Simbol," of which "174,200 shares were granted as a result of activities related to licensing of technology to Simbol prior to Burba's appointment as CEO."[177] The remaining approximately 2,100,000 common shares sold or transferred to Burba, the Plaintiffs stress, "represented almost exactly the number of Erceg Shares which became void immediately upon the transfer from Erceg to the Company."[178] "After becoming Simbol's CEO, Burba was placed on the Board by way of a written consent of common stockholder dated August 9, 2013. The written consent was based in large part on Burba voting his own shares in favor of the appointment to the Board."[179]

The Plaintiffs urge me to examine this series of events as a single transaction—a scheme designed specifically to dilute Conley's interest in Simbol and to reduce the influence of the founders, Conley and Erceg.[180] The Plaintiffs'

---

[174] *Id.*

[175] *Id.* at ¶ 94.

[176] *Id.* at ¶ 100.

[177] *Id.* at ¶ 110.

[178] *Id.*

[179] *Id.* at ¶ 115.

[180] I note that, standing alone, the allegations regarding the Erceg Settlement fail to state a direct dilutive claim. The Plaintiffs attempted to salvage this claim, arguing in response to my question

42

cause of action, as I understand it, is this: MDV, aided by various members of the Board, conspired to defraud certain of the common stockholders and consolidate control of Simbol by, first, failing to disclose Erceg's breach of the ROFR in selling his shares back to Simbol and, second, taking those shares thus improperly returned to the Company and issuing them to Burba, a new CEO, who was beholden to or controlled by MDV in some (unknown) manner.[181] In other words, all of these actions were part of a scheme to put Erceg's shares with an individual friendly to MDV and to dilute the Plaintiffs' ownership interests in Simbol. Again, it is

---

at Oral Argument as to how the allegations regarding Erceg's failure to give notice under the ROFR constitutes a breach of fiduciary duty claim, rather than a contract claim, that "the breach of fiduciary duty is in the defendants knowing that there's a right of first refusal, that it should have been offered to Mr. Conley to have his right to exercise his right of first refusal, and they intentionally did not proceed according to the contract, in furtherance of this scheme to dilute Mr. Conley and to minimize his voting power," presumably by issuing the shares to Burba. Oral Argument Tr. 63:13–20.

[181] *See* Compl. ¶¶ 5, 111–12, 132. I note two other claims related to the Erceg Settlement and Burba share issuance that were not specifically asserted as direct dilution claims at Oral Argument. First, the Plaintiffs allege that "Burba had knowledge that the written consent included the void Erceg Shares to vote himself on the Board. Green and MDV knew the Erceg Shares were void but still allowed Burba to vote those shares to get himself on the Board. Consequently, Burba's placement on the Board was an ultra vires act by the Company and improper." *Id.* at ¶ 115. To the extent the Plaintiffs still pursue this claim, I find that these allegations form the basis for a derivative claim, for which demand futility should have been pled. *See SEPTA v. Volgenau*, 2012 WL 4038509, at *3 n.17 (Del. Ch. Aug. 31, 2012) ("Any harm from a director's *ultra vires* action during a corporation's on-going operations would likely inure to the corporation itself, and thus, would only provide a basis for a derivative claim." (citing *Tooley*, 845 A.2d at 1033)). Second, the Plaintiffs argue, with respect to the "equity contributions" made by Itochu and MDV as part of the Erceg Settlement, that "Itochu and MDV breached their fiduciary duties by forcing the Company to assume liability and then investing in the Company as part of the Erceg Settlement— thus, gaining further stock ownership at the expense of other investors while simultaneously absolving their own liability and conspiring to defraud other parties to the ROFR in a series of step transactions." Compl. ¶ 117. I do not understand this allegation, and in any event, the Plaintiffs have failed to allege facts to demonstrate that MDV owes fiduciary duties as a controlling stockholder.

important to note that, although the Plaintiffs allege that Erceg violated his contractual rights to give notice to Conley and others of the sale, the Plaintiffs have not brought an action against Erceg, nor have they sought a contract remedy to specifically enforce their contractual rights with respect to the allegedly "void" shares.[182] Instead, they seek only a claim for breach of duty against MDV and certain of the Director Defendants, for not insuring that the Plaintiffs received notice and also for reissuing the shares to the new CEO. Again, for relief, the Complaint seeks "all" past and future damages relating to all wrongdoing alleged in the complaint as a whole.

Because I have found that the Plaintiffs failed to demonstrate MDV is a controlling stockholder, as discussed above, I dismiss this claim with respect to MDV.[183] That leaves for my consideration whether the Plaintiffs have properly stated a claim against two Director Defendants alleged to have been a part of the Board at the time: Sunada and Green. Even considering the allegations above as a scheme, I find that the Complaint lacks specific allegations necessary for me to evaluate the claim. I do not know, because the Complaint fails to allege, for

---

[182] Or, looked at properly, to seek a declaration that the transaction is void and that the shares remain with Erceg. *See supra* note 99 and accompanying text.

[183] In fact, the Plaintiffs have essentially admitted that MDV did *not* control the Board at the time of the Erceg Settlement or issuance of shares to Burba. The Complaint alleges that, in March 2013, MDV and Itochu entered into a side agreement, under which MDV assigned its right to select a second Board designee to Itochu, thereby "granting *Itochu* control of the Board." Compl. ¶ 97 (emphasis added).

example, whether Conley or any of the other contractual parties to the ROFR knew about the repurchase of the Erceg Shares before it occurred; whether Conley, if given notice, would have in fact repurchased shares, or to how many shares he would have been entitled; the complete composition of the Board at the time of the issuance of shares to Burba;[184] the date on which that issuance was approved; that the shares granted to Burba were the same shares sold back to the Company by Erceg;[185] that no treasury shares were available from which to issue shares to Burba;[186] or that Burba was controlled by or beholden to MDV.[187] The Complaint only alleges that a

---

[184] Though the Complaint alleges that Sunada, Nishio, and Green sat on the Board at the time of the Erceg Settlement, I presume based on earlier allegations in the Complaint that this is not the complete composition of the Board at the time. *See supra* note 68. Additionally, the Complaint does not specify the date on which Burba was awarded shares, except to suggest that the award took place at some time between the Erceg Settlement in July 2013 and August 9, 2013, the date on which Burba was placed on the Board by way of written consent of the common stockholders. From these allegations, I cannot determine with certainty whether Nishio sat on the Board when Burba was awarded the roughly 2.1 million additional shares.

[185] The Plaintiffs insisted at Oral Argument that these are the same shares, but this was not pled clearly in the Complaint. *See supra* note 105 and accompanying text; Oral Argument Tr. 60:7–17 ("So here's the take-away from the Erceg settlement, Your Honor, and the only take-away that's relevant here today. And that is the shares of Erceg that were transferred, eventually, to Burba. And it's, you know, 2.1 million shares. *It's the same shares*. And we allege something, I think, akin to that in the complaint. You don't come up with a number of 2.1 million, you know, being transferred from Erceg and then finding its way into Burba's pocket. And that's the only take-away, Your Honor.") (emphasis added).

[186] As I find that the Plaintiffs have not clearly alleged that Burba was in fact issued the Erceg shares, without knowing whether the Company held any treasury stock, it is impossible to determine whether Burba was issued the Erceg shares, which had previously been returned to the Company (via the allegedly void Erceg Settlement), or whether the Erceg shares were merely returned to a pool of treasury stock, from which Burba was issued distinct "issued," but not "outstanding," shares, untainted by a breach of the ROFR rights.

[187] I find insufficient the Plaintiffs' conclusory allegation that the Defendants sought to "[f]orce out CEO who attempted to resist Defendants' breach of fiduciary duty and replace him with one who they knew they could control and give them what they want." Compl. ¶ 5. Once again, I list these absent factual allegations here to provide context, not to suggest that any one alone is dispositive.

Director with divided loyalties to MDV (Green) was on the Board when Burba received the shares.[188] Plaintiff could have obtained pertinent facts through an action under Section 220, instead of suggesting that the Court speculate as to the existence of a claim. Finally, I note that the Plaintiffs are alleged to have held the *same* ownership percentage in Simbol before and after this transaction; thus, on the facts before me, even considering the Erceg Settlement and Burba share issuance as one nefarious transaction, it is not reasonably conceivable that the Plaintiffs suffered dilution of their interests, although they may have lost a contractual opportunity to increase their interests.

Accordingly, I also dismiss this claim in Count I as to the remaining Director Defendants for failure to state a claim.

*C. Aiding and Abetting a Breach of Fiduciary Duty*

Finally, I turn to the aiding and abetting claim in Count II. To plead an aiding and abetting claim, a plaintiff must allege: "(1) the existence of a fiduciary relationship, (2) a *breach of the fiduciary's duty, . . .* (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach."[189] In other words, an aiding and abetting claim is predicated on an underlying breach

---

[188] The Complaint, however, also alleges that Green had resigned prior to this point. *See supra* note 80.

[189] *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001) (emphasis added).

of fiduciary duties.[190]  Here, because I find that Count I fails to adequately allege a breach of duty, I must also dismiss Count II for failure to state a claim.[191]

D. *Plaintiffs' Request to Dismiss Without Prejudice*

At Oral Argument, the Plaintiffs asked that any dismissal be without prejudice, to allow them to re-plead with sufficient facts to support their claims. Rule 15(aaa) bars such a dismissal here.  The Motions to Dismiss and their associated opening briefs pointed out the fundamental pleading deficiencies here, and pointed out that the Defendants were unclear what wrongs had been pled against them that they must defend, as well as how direct (as opposed to derivative) claims had been pled.  The Plaintiffs at that point had the opportunity to elect to re-plead, and instead filed an answering brief.  It was not until Oral Argument that the Plaintiffs defined clearly the transactions that they believe have caused them direct harm.

The Plaintiffs' election to brief and argue the Motions to Dismiss, rather than re-plead, is binding here.

## IV. CONCLUSION

The Plaintiffs have alleged numerous bad acts over the course of several years, which conduct, they argue, has had the cumulative effect of bringing the Company

---

[190] *See Globis Partners, L.P. v. Plumtree Software, Inc.*, 2007 WL 4292024, at *15 (Del. Ch. Nov. 30, 2007) (stating that a valid claim for aiding and abetting a breach of fiduciary duty requires a primary fiduciary to have breached its duty).

[191] *See Weil v. Morgan Stanley DW, Inc.*, 877 A.2d 1024, 1039 (Del. Ch. 2005) (dismissing aiding and abetting claim where the underlying breach of fiduciary duty claim failed to state a claim).

to the brink of financial disaster and which, in two instances, have harmed the Plaintiffs individually as well as the Company. These allegations, if true, will go unremedied here. I am consoled, however, by the fact that any stockholder may still bring a derivative suit if, after pursuing the rights granted to her under Section 220, she can properly state a claim. For the foregoing reasons, I grant the Defendants' Motions to Dismiss. An appropriate order accompanies this Memorandum Opinion.

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| THERMOPYLAE CAPITAL PARTNERS, L.P. and M. SCOTT CONLEY, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 10619-VCG |
| | ) | |
| SIMBOL, INC., JOSHUA L. GREEN, PAUL B. CLEVELAND, WILLIAM ERICSON, MOHR DAVIDOW VENTURES, MDV IX, L.P., TAKASHI SUNADA, ITOCHU CORPORATION, JOHN ASHBURN, MARTIN L. LAGOD, FIRELAKE STRATEGIC TECHNOLOGY FUND, II, L.P., FIRELAKE INVESTORS FUND, II, L.P., FIRELAKE CAPITAL MANAGEMENT LLC, and JOHN BURBA, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## **ORDER**

AND NOW, this 29th day of January, 2016,

The Court having considered the Defendants' Motions to Dismiss, and for the reasons set forth in the Memorandum Opinion dated January 29, 2016, IT IS HEREBY ORDERED that the Motions to Dismiss are GRANTED.

SO ORDERED:

/s/ Sam Glasscock III

Vice Chancellor